**Glenn W. GIBBONS, Plaintiff,**

v.

**James H. BURNLEY, IV, Secretary, Department of Transportation, Federal Aviation Administration, United States of America, Defendant.**

Civ. No. 88–0218–P.

United States District Court,
D. Maine.

May 14, 1990.

Claudia C. Sharon, Dennis Levandoski, Portland, Me., for plaintiff.

David R. Collins, Paula D. Silsby, Asst. U.S. Attys., Portland, Me., for defendant.

## MEMORANDUM OF DECISION AND ORDER GRANTING PLAINTIFF'S CLAIM OF AGE DISCRIMINATION

GENE CARTER, Chief Judge.

Plaintiff filed suit with this Court pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*[1], alleging that his discharge from a position with the Federal Aviation Administration (FAA) was the result of age discrimination. Defendant maintains that the FAA did not discriminate against Plaintiff and that the policy which caused Plaintiff's termination during his one-year probationary term was not, in and of itself, discriminatory. The Court, sitting without a jury, finds that Plaintiff has met the burden of proving, by indirect evidence, that Defendant's reason for firing Plaintiff was a pretext for age discrimination.

Plaintiff began work as an aviation safety inspector in the Airworthiness Unit at the Flight Standards District Office of the FAA in Portland, Maine on July 7, 1986, his sixty-fifth birthday. John Van Horn, district manager for the Portland FAA office, made the decision to hire Plaintiff as an airworthiness inspector. The airworthiness inspector's job entailed the enforcement of FAA regulations concerning the mechanical and maintenance operations of airplanes. Plaintiff's immediate supervisor upon reporting to work was James Sheppard; Van Horn had overall responsibility for all personnel.

Approximately one month after starting work, Plaintiff was sent to indoctrination school for nine weeks. On September 30, 1986, James Sheppard retired and Van Horn became Plaintiff's supervisor. Van Horn assigned David Crook to supervise Plaintiff on December 6, 1986. On June 15, 1987, Van Horn discharged Plaintiff, ostensibly for Plaintiff's prior Federal Aviation Regulation (FAR) violations. Plaintiff filed this suit on July 19, 1988.

### DISCUSSION

■■■ The legal standard in this area is well settled. The central issue to be determined is whether Plaintiff's age "was the 'determining factor' in his discharge in the sense that, 'but for' his employer's motive to discriminate against him because of age, he would not have been discharged."[2] *Herbert v. Mohawk Rubber Company,* 872 F.2d 1104, 1110 (1st Cir.1989), *citing Loeb v. Textron, Inc.,* 600 F.2d 1003, 1017, 1019 (1st Cir.1979).[3] In order to make out a case of age discrimination pursuant to ADEA, Plaintiff must first establish the following *prima facie* case:

(1). that he was within the protected age group—that is, 40–70 years of age;

(2). that he was fired (actually or constructively);

1. The ADEA states in pertinent part:

 (a) Federal agencies affected. All personnel actions affecting employees or applicants for employment who are at least 40 years of age ... shall be made free from any discrimination based on age.

 29 U.S.C. § 633a.

2. Plaintiff also argues, under a disparate impact model of proof, that Defendant's policy of firing individuals with FAR violations discriminates against older employees. The Court finds both that Plaintiff offers insufficient statistical evidence to support this claim and that this claim is made moot by the Court's finding that there was no such policy enforced. *See supra* at 1221.

3. The test set out in *Loeb* also applies to a section 633a claim. *See Shostak v. United States Postal Service,* 662 F.Supp. 158, 160–61 (D.Me. 1987); *McDermott v. Lehman,* 594 F.Supp. 1315, 1322 (D.Me.1984). Section 633a extends to federal employees the same protection against age discrimination that the ADEA affords to private sector employees although the federal government is not subject to other ADEA provisions. *Valaris v. Army & Air Force Exchange Service,* 577 F.Supp. 282, 286–87 (N.D.Cal.1983).

(3). that he was qualified for the job from which he was fired, in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative; and

(4). that he was replaced by someone with qualifications similar to his own, thus demonstrating a continued need for the same services and skills.

*Herbert,* 872 F.2d at 1110, *citing Loeb,* 600 F.2d at 1013. The establishment of the *prima facie* case creates an inference of discrimination, thus shifting the burden of production to Defendant to articulate a legitimate reason for firing Plaintiff. *Medina–Munoz v. R.J. Reynolds Tobacco Company,* 896 F.2d 5, 9 (1st Cir.1990); *Herbert,* 872 F.2d at 1111. Plaintiff maintains the burden of persuasion, however, at all times. *Medina–Munoz,* 896 F.2d at 9.

■ If Plaintiff causes the burden of production to shift, Defendant must provide a valid, nondiscriminatory reason for firing Plaintiff. *Loeb,* 600 F.2d at 1011–12. The reason provided must be valid in the sense that it must provide Plaintiff an opportunity to disprove it and must permit the factual inquiry to proceed at a new level of specificity. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256–57, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *Loeb,* 600 F.2d at 1011 n. 6. Defendant need not, however, persuade the Court that he was, in fact, motivated by the reason provided and not by a discriminatory reason. *Loeb,* 600 F.2d at 1011.

■ Thus, the inference of discrimination created by Plaintiff's establishment of a *prima facie* case dissolves if Defendant can articulate a nondiscriminatory reason

for the discharge. *Medina–Munoz,* 896 F.2d at 9. Plaintiff must then prove that the reason articulated by Defendant is merely a pretext for illegal discrimination. *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973); *Loeb,* 600 F.2d at 1014. Plaintiff need not, however, provide direct evidence of discriminatory motivation. *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973); *Loeb,* 600 F.2d at 1014. Beginning with Plaintiff's *prima facie* case, the Court will set out its findings of fact with respect to the legal standards outlined above.

### Prima Facie Case

■ Plaintiff argues that he established the required *prima facie* case at trial. The Court agrees. While Defendant admits that Plaintiff has met three of the elements of the *prima facie* case, namely that Plaintiff is older than forty, was fired, and was replaced by someone similarly qualified, Defendant contends that there is a serious question as to whether Plaintiff was performing his job adequately when he was discharged. Defendant's Post Trial Brief at 15 n. 5, 21. Defendant's contention is unfounded.

■ The requirement that Plaintiff prove he was qualified for the position he held is designed to force Plaintiff to rule out the possibility that he was fired for inadequate job performance. *Loeb,* 600 F.2d at 1013. Van Horn, manager of the Portland office of the FAA and Plaintiff's boss, noted that Plaintiff's job performance had no effect on his decision to terminate Plaintiff. Transcript (Tr.) at 706. Thus, there can be no question that Plaintiff has satisfied this element of the *prima facie* case.[4]

---

**4.** The Court also notes that the evidence at trial indicates that Plaintiff was qualified to perform his job. Although Crook, Plaintiff's supervisor, gave Plaintiff a poor evaluation and testified that Plaintiff's performance did not improve, therefore subjecting Plaintiff to a possible discharge, this testimony was not credible. For example, after Plaintiff had been removed, Crook told an investigator that Plaintiff *had*

improved, directly contradicting his testimony before this Court. Plaintiff's Exhibit (Ex.) 28 at 5. Furthermore, the Court finds the basis for Crook's evaluation of Plaintiff highly questionable since it was based on "common sense" and not a thorough review of all of Plaintiff's work. *See, e.g.,* Tr. at 158, 507, 526–29, 541, 544. Finally, Van Horn stated that there was no prob-

*Legitimate Reasons For Discharge*

 Plaintiff's establishment of a *prima facie* case creates the inference that Defendant discriminated against Plaintiff. Defendant, however, rebuts this inference by stating that it fired Plaintiff because of the Federal Aviation Regulation (FAR) violations in Plaintiff's background. Neither party disputes that FAR violations were the stated reason for Plaintiff's termination. Defendant's Exs. 7, 9. Plaintiff, however, maintains that Defendant's articulated justification for termination, the FAR policy, necessarily discriminates against older employees. Plaintiff states that because older employees are more likely to have a greater number of FAR violations, Defendant's proffered reason for terminating Plaintiff is discriminatory on its face. The Court finds that Plaintiff's allegation is without merit.

Plaintiff provides no support for this proposition. It is certainly unclear that a greater amount of aviation experience can be equated with a greater number of FAR violations. Indeed, it is not even clear that older people are likely to have a greater amount of aviation experience.[5] Thus the Court finds that Defendant has met his burden of production by articulating a nondiscriminatory, valid reason for Plaintiff's discharge. Plaintiff must therefore prove that Defendant's use of the FAR violations was a mere pretext for discriminating against Plaintiff on the basis of age.

### Pretext

Defendant did not, as the FAA witnesses at trial stated, fire Plaintiff because of his FAR violations. The testimony of Defendant's witnesses, Van Horn and Crook, regarding the firing of Plaintiff was contradictory and not credible. Furthermore,

Plaintiff has proved that (1) he was the oldest airworthiness inspector ever hired; and (2) he was treated differently than similarly situated employees in that he was not permitted to do the type or amount of work they did and was delegated to do menial jobs or jobs that involved another elder employee. This circumstantial evidence is sufficient to prove that the reason given by Defendant for his discharge was a pretext *for* age discrimination.

The history and application of the Portland office FAR violation policy reveal that this policy simply did not exist prior to Plaintiff's termination. For example, Van Horn stated that it was his policy that no inspector of the FAA could have a prior FAR violation. Tr. at 724. Despite this policy, Van Horn admitted that he had never utilized it in the past. Tr. at 776. Van Horn, in fact, admitted that he had never even asked about the violation background of any of his employees prior to this case. Tr. at 723–24. In addition, Van Horn stated that his FAR policy was not an FAA policy, but rather his own personal policy. Tr. at 724. He did not explain his policy to Sheppard, although Sheppard was a supervisor who helped in the hiring process and no FAA application form requests this information from prospective employees. *See* Tr. at 264, 776. In response to questions posed by the Court, Van Horn admitted that his secret policy was "unfair" in that an applicant would have no warning that such a policy existed, and that it was "not a good rule." Tr. at 774–76. Thus, this "policy" of Van Horn's was a secret policy that he never utilized until he sought a reason to terminate Plaintiff.

Furthermore, Van Horn never exercised his alleged "policy" despite the fact that Plaintiff's supervisor, Crook, had a pending FAR violation.[6] Tr. at 720–21. Upon

---

lem, at all, with Plaintiff's work. Plaintiff's Ex. 28.

5. Plaintiff argues that he provided statistical evidence that Defendant's policy resulted in 100% of the probationary employees over sixty years of age being discharged. Plaintiff was, however, the only employee over sixty. The Court is unconvinced by such statistical analysis.

6. At the time of his probationary period, Crook actually had one FAR violation and another FAA office was investigating whether subsequent conduct constituted another violation. The investigation eventually resulted in the second alleged violation being dropped. Crook told Van Horn about only the second alleged infraction, and Van Horn took no action to learn about Crook's first violation. Tr. at 720–21.

learning from Plaintiff that Plaintiff had an FAR violation, Van Horn suggested to his superiors that a security investigation, including a full background check be undertaken. Tr. at 694. In contrast, when Van Horn learned that Crook might have had a FAR violation, he never asked about other violations, he did not request a security investigation, and he did not look into Crook's records. Tr. at 720. Discovering information regarding prior FAR violations would have been easy enough in either Plaintiff's or Crook's situation, and would have negated the need for an extensive security check since Van Horn could have obtained information concerning employees' or applicants' prior FAR violations with the push of a computer button from the Portland office.[7] Tr. at 690. The Court finds, therefore, that Van Horn's secret policy regarding FAR violations— which he never articulated, never enforced, or even attempted to enforce despite having the means to quickly check his employees' violation records—did not exist.[8]

In addition, the unreasonableness of the decision to terminate Plaintiff because of his FAR violations buoys the finding that Defendant's articulated justification was merely a pretext. The *Loeb* court noted that

> [t]he reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext, if indeed it is one."

*Loeb*, 600 F.2d at 1012 n. 6. The evidence at trial illustrates the irrationality of De-

fendant's stated reason for terminating Plaintiff.

For example, Sheppard, Plaintiff's first supervisor, testified that Crook's violation was a mechanical violation and was serious in relation to his job as an airworthiness inspector. Tr. at 441. In contrast, Sheppard noted that Plaintiff's violations, because they concerned his conduct as a pilot rather than as a mechanic, were inconsequential in regard to his job as an airworthiness inspector. Tr. at 442. In fact, even the FAA standards regarding FAR violations, promulgated in 1988, would not disqualify someone with Plaintiff's FAR violations for the position of airworthiness inspector. Plaintiff's Ex. 26. Thus, the record in this case supports the Court's finding that Defendant's articulated justification was a pretext.

 In order for Plaintiff to prevail, however, Plaintiff must also prove that the pretext was intended to mask age discrimination. *Loeb*, 600 F.2d at 1014. This is a difficult proposition to prove. Because it is rare that there is direct evidence of discrimination, courts do not require a plaintiff to provide direct proof, but allow a plaintiff to prove discrimination by circumstantial or indirect evidence. For example a plaintiff may prove discrimination by demonstrating that the facts surrounding his treatment while employed, and how his employer treated other similarly situated employees, indicate that Defendant's actions were unlawfully motivated. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 805, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973). Plaintiff provides circumstantial evidence that indicates the De-

---

Defendant argues that Crook's situation was different from Plaintiff's because the discovery of Crook's alleged second violation occurred after Crook had completed his probationary period. Tr. at 721. The Court notes that this is true only because Crook did not inform Van Horn of the information until after his probationary period. Tr. 456, 721. Furthermore, Van Horn stated that the fact Plaintiff was still in his probationary period had no effect on Van Horn's understanding of his discretion to enforce his FAR violation policy. Tr. at 700. Thus, Van Horn's policy itself did not distinguish between probationary employees and other employees.

**7.** Van Horn testified that he believed his office had computer access to this information "early in 1986." Tr. at 690. This was prior to the time Plaintiff began work with the FAA.

**8.** An additional, probative, fact that further supports this finding is that approximately seven months expired between the time Van Horn first became aware of Plaintiff's recent FAR violation and his termination. The Court finds no credible reason for this delay if FAR violations, pursuant to Van Horn's expressed policy, were the reason for Plaintiff's discharge.

fendant did not treat him like employees similarly situated, that he was singled out because of his age, and that, but for his age, he would not have been discharged.

Plaintiff was the oldest person hired for the position of airworthiness inspector that any witness could remember Defendant had ever hired. Plaintiff was sixty-five years old the day he reported to work in the Portland, Maine office. Defense witness Katrina Newlin, who facilitates the hiring of FAA employees for the entire New England region, testified that she believed the FAA hired, as an airworthiness inspector, only one other individual as old as Plaintiff. Tr. at 299. Questioning by the Court, however, revealed that the FAA hired this other individual one year before this case went to trial. *Id.* Thus, although there were employees in other job classifications, including Van Horn, in the Portland office who were of Plaintiff's age, no witness at trial had even heard of a sixty-five-year-old probationary airworthiness inspector at the time of Plaintiff's tenure with the FAA. *See, e.g.,* Tr. at 53, 299, 714, 782–83.

Plaintiff was not treated like the other employees who were similarly situated. At approximately the time Plaintiff began work, there were other probationary airworthiness inspectors at the Portland office. Those other inspectors were assigned to air carriers, a critical job function constituting 60–70% of an airworthiness inspector's job,[9] during their probationary period.[10] Plaintiff, however, was not assigned that critical job function. Tr. at 578. Defendant delegated little work to Plaintiff, while assigning his counterparts so much work that they were overloaded. Tr. at 32, 48–49. The reasons provided at trial for not assigning Plaintiff to an air carrier were demonstrative of defense witnesses' lack of candor and evasiveness.

Crook, Plaintiff's supervisor from December 1986 until Plaintiff was dismissed, explained that the other probationary inspectors were assigned to air carriers because their background work experience had prepared them for such an assignment. Tr. at 538. Crook stated that Plaintiff simply did not have the right experience. Tr. at 471, 538. Upon cross-examination, Crook admitted that he had not seen the FAA hiring documentation on Plaintiff's background. Tr. at 520–21. Crook stated that he knew of Plaintiff's background and experience from what other people had told him about Plaintiff. Tr. at 535. The only person, however, with whom Crook could remember discussing Plaintiff's background, spoke to Crook in April of 1987, long after any decision to assign or reassign Plaintiff would have been made.[11] Tr.

---

9. The job application for airworthiness inspectors describes the position and job responsibilities as "the inspections and surveillance of maintenance activities of an *assigned group of air carriers* and other aviation maintenance operators." Defendant's Ex. 1 at 2 (emphasis added).

10. There was conflicting testimony as to whether these probationary employees were assigned to air carriers as principal or assistant inspectors. The critical issue, however, is that Plaintiff was not assigned to the same crucial tasks as were the other probationary employees.

One inspector, however, James Edwards, was also not assigned to an air carrier. Edwards may be distinguished from Plaintiff and the other probationary employees because he had no previous experience and was employed as part of a special developmental program.

11. Throughout the trial both Crook and Van Horn made references to conversations they had about Plaintiff that were initiated by FAA officials in other offices. *See, e.g.,* Tr. at 738–41,

787, 535. In this situation, Crook explained that a Mr. Christiansen had spoken to him about Plaintiff at approximately the time Crook filled out Plaintiff's evaluation. Tr. at 535.

Furthermore, Crook stated he believed he had spoken with Van Horn about Plaintiff's background. Tr. at 539. The Court, in light of Crook's overall testimony on this subject, finds that a conversation with Van Horn about Plaintiff's background experience did not take place. Tr. at 538. An example the Court finds indicative of Crook's testimony is as follows:

Q: And you indicated to [Christiansen] that you really had no authority to deal with his removal as well; is that right?

A: That's right.

Q: So the subject of removal came about with Mr. Christiansen; is that right?

A: No, I don't believe that subject was ever discussed at all.

Q: You just indicated in response to my question, Mr. Crook, that you told Mr. Christianson you had nothing to do with his removal; is that right?

at 535, 604–06. In fact, Crook eventually testified that he merely "thinks" he knew of Plaintiff's background before Plaintiff was fired. Tr. at 538.

Crook also testified that he knew of Plaintiff's background and experience by observing his job performance at the office. Tr. at 533. He explained that his previous testimony might have been misleading, and that, in fact, it was Plaintiff's job performance that indicated Plaintiff could not be assigned to an air carrier. Tr. at 534. Crook, however, was subsequently confronted on cross-examination with an affidavit he had signed on January 27, 1987, in which he stated that (1) assignments are given based on work history; (2) Plaintiff's assignments were given to him based on his past experience; (3) Plaintiff could not do the work of other probationary inspectors because of his job performance and attitude, plus the fact that the work areas were not compatible with Plaintiff's experience. Tr. at 538. Finally, Crook's last statement on this issue was that he knew of nothing in Plaintiff's background that would affect Plaintiff's job performance. Tr. at 539. Thus, Plaintiff was not treated like the other probationary employees who were assigned to air carriers. The Court finds no credible reason for this different treatment.

Plaintiff was also treated differently from the other employees in that he spent a good deal of time working with David Ramsbothem. Ramsbothem, the oldest inspector except for Plaintiff, was an accident prevention specialist. Ramsbothem's job primarily consisted of giving slide shows and seminars about safety. Other inspectors did not like this duty. Tr. at 31. Plaintiff went on five speaking engagements in his eleven months with the FAA. Tr. at 162–63. Prior to Plaintiff's joining the FAA, this duty had been rotated among the staff, and staff members did not work as extensively with Ramsbothem as did Plaintiff. For example, Jim Edwards, a probationary inspector, went on only two speaking engagements with Ramsbothem

in four years of working with the FAA. Tr. at 630, 640. Thus, Plaintiff spent a good amount of time with the other older inspector, giving seminars, but not inspecting airplanes. It seems no coincidence that Van Horn asked Plaintiff to work with Ramsbothem. Plaintiff was simply not treated like the other inspectors.

The Court finds the above evidence sufficient to prove by a preponderance that Defendant's justification for firing Plaintiff was a pretext for age discrimination. Defendant, however, points out that the FAA would not have hired Plaintiff at age sixty-five only to subsequently participate in age discrimination against Plaintiff. The testimony at trial does not support Defendant's argument, and, in fact, raises questions that may add fuel to the discrimination fire.

In support of Defendant's argument, Van Horn testified that he noted Plaintiff's age when reviewing his application form prior to hiring Plaintiff. Tr. at 672. Six months after Van Horn discharged Plaintiff, however, Van Horn told an investigator that he did not even know if the standard application form asked for the date of birth of the applicant. Plaintiff's Ex. 27 at 7. Sheppard, who participated in Plaintiff's hiring, noted that he generally checked the age of applicants, but stated he had no specific recollection of Plaintiff's application. Tr. at 429–30. Thus, the Court finds that the Portland office may not have known Plaintiff's age.

On the other hand, evidence at trial indicated that the system by which Plaintiff was selected was flawed to the extent that the Portland office may have *had* to hire Plaintiff. Katrina Newlin of the regional personnel office, who is responsible for recruiting and hiring individuals according to FAA guidelines for the New England FAA district offices, attempted to describe the process by which Plaintiff's name was presented to Van Horn and the Portland office. Newlin's testimony was both contradictory and confusing. Tr. at 385–2.

A: No, he had not been removed. I mean that information from Mr. Christiansen was simply what his feelings were down in the

Philadelphia area. I had no authority to remove or—I did have authority to recommend. Tr. at 621–22.

(The Court noted on the record that after it questioned Newlin, it was left with further questions about the accuracy of her testimony and was left in an even greater state of confusion regarding the meaning of her testimony.)

For example, Newlin stated that when Plaintiff was hired, the FAA had a policy that no one with *any* FAR violations could be hired. Tr. at 264. On cross-examination, the following facts became clear: (1) she did not know what the current FAR policy is (Tr. at 268); (2) she could not explain how she came to know of the old policy (Tr. at 269–70); (3) the application forms did not ask about violations, and she had no way to check if an applicant had a violation (Tr. at 264, 266–67); (4) she did not know if one or more violations were required to disqualify a candidate under either the old or new policies (Tr. at 269); and finally (5) she admitted that she did not know if any such policy had existed at the time Plaintiff was hired (Tr. at 272).

Newlin's testimony concerning the hiring process fared no better. Newlin testified that upon notice of the availability of airworthiness positions in Portland, she would contact the main office in Oklahoma City, Oklahoma, which would submit names and applications on the basis of the number of positions needed to be filled. Tr. at 248–49. Upon receipt of the certificate of eligibles, Newlin would notify the individuals named, and it is the required or common practice that each applicant be interviewed.[12] Tr. at 253–54, 278–80. This hiring procedure is designed as a competitive process in which managers pick from a pool of eligibles. Tr. at 364. Newlin stated that as each candidate is considered for a position (candidates may be considered three times), she places a "C" next to their names.

While the process Newlin described above may, in theory, be the FAA hiring policy, the process applied to Plaintiff's hiring was substantially different. Newlin admitted that, in response to a request for a specific applicant for an airworthiness inspector's position by the New Hampshire FAA office, she sent only one application to that office despite having a proper list of eligibles containing approximately five applicants' names. Tr. at 330–36. That single applicant was hired, and no other current applicants were considered for the New Hampshire post. *Id.* at 331.

Newlin stated that her handling of that appointment was against FAA hiring procedures and regulations. Tr. at 349–50. Officials at Oklahoma City informed Newlin of the error. Tr. at 351. The New Hampshire applicant would lose his new job if Newlin did not, somehow, rectify her error. Tr. at 349–50. Newlin and her supervisor decided that this harsh consequence could be avoided if other vacancies for airworthiness inspectors could be filled from the same list of eligible candidates. Tr. at 352–54. Plaintiff was one of the individuals on that list. Defendant's Ex. 3. Newlin testified that the managers of FAA offices would thus have to hire three people from that list if the New Hampshire applicant were to keep his job. Tr. at 354. Thus the competitive, neutral process was deliberately skewed from the start by what the Court finds to have been a deliberate covert attempt to hide the prior improper hiring conduct with respect to the New Hampshire position.

Other discrepancies in the theoretical process soon followed. Newlin was not sure whether Van Horn saw any applications other than Plaintiff's and one other applicant whom Van Horn hired.[13] Tr. at

---

**12.** Newlin's testimony vacillated in regard to whether an interview was required. On pages 278 to 284 of the trial transcript, Newlin stated that such interviews were common practice (Tr. at 278), that they were required (Tr. at 278), that they were not required (Tr. at 280), and that, upon presentation of documentation by the opposing attorney, the FAA required them in 1984 and in 1986 (Tr. at 282–84).

**13.** One major contradiction in Newlin's testimony is that she testified that she had a specific recollection of Van Horn and other managers coming to her office to review the applications. Tr. at 296, 299. The following day, after speaking to counsel and finding out that Van Horn would testify that the applications were sent to Maine, Newlin testified that perhaps she did, indeed, *send* the applications to Maine. Tr. at 340–42. While the issue of whether the applications were sent to Van Horn, as opposed to Van

296. Despite the fact that it is standard FAA operating procedure to conduct interviews, none of the candidates hired in the Portland office was interviewed in the time frame in which Plaintiff was hired. Tr. at 670–72.

Furthermore, Newlin stated that all the candidates on her list of eligibles were considered for various airworthiness positions in New England. Tr. at 381–83. Newlin would mark a "C" near an applicant's name each time the applicant was considered for a position. While Newlin stated that Plaintiff was considered along with all the other candidates for various positions, she did not mark a "C" near his name to indicate that he was considered as she did with all the other applicants. *Id.* Newlin could not explain why her notes indicated that he alone was not considered for any position other than the position for which he was hired. Tr. at 383. Thus, Newlin's notes indicate that Plaintiff was considered for only the Portland job.

Finally, the Portland office may have had to hire Plaintiff for another reason. Van Horn testified that at the time he hired Plaintiff, there was an FAA drive to fill positions. Tr. at 670. Van Horn admitted that he was anxious to hire another airworthiness inspector before September 30, 1986 because he would lose the extra, recently created position if he failed to hire someone by fiscal year-end. Tr. at 778. The extra position would not, however, be lost if an applicant were hired and then dismissed during his probationary period. *Id.*

Thus, the procedure by which the FAA hired Plaintiff was irregular and noncompetitive. It did not illustrate that age discrimination by the FAA was unlikely, but rather, raised questions as to what discretion the Portland office enjoyed in deciding whom to hire. There is evidence that Plaintiff was considered for only the Portland job and that Portland may have *had* to hire Plaintiff before September 30, 1986 to retain the position he filled. The Court also finds that the evidence does not support the conclusion that Defendant knew Plaintiff's age when he hired Plaintiff. Thus, not only did the hiring process fail to support Defendant's statement that he would not have hired Plaintiff only to discriminate against him, but may add further weight to the circumstantial evidence that Plaintiff was fired because of his age.[14]

In sum, Plaintiff was older than any other probationary employee; he was treated differently from similarly situated employees for no credible reason; he spent an unusual amount of time giving seminars with an elder accident prevention inspector; he was hired by a process that raises questions as to whether the Portland office knew of his age and as to the discretion of that office in the hiring process; and finally, defense witnesses, Van Horn, Crook, and Newlin, were not credible witnesses. The Court concludes that the above findings constitute sufficient circumstantial evidence to prove, by a preponderance of the evidence, that Defendant's reason for firing Plaintiff was a pretext *for* age discrimination.

## REMEDIES

 Plaintiff's Complaint seeks four hundred thousand dollars ($400,000) in liq-

---

Horn coming to view them, is not crucial to this case, the Court finds the issue to be yet another example of inconsistent testimony damaging the witness's credibility.

14. The Court's findings of fact are avowedly based to no inconsiderable extent upon the Court's negative view of the credibility of the Defendant's witnesses. The testimony of Van Horn, Crook, and Newlin was, in terms of credibility, among the least reliable testimony that *this Court has ever heard given under oath.* Except for the testimony of Mr. Sheppard, who appeared to be disinterested in the result of the case and to make a sincere effort to tell the

truth and let the chips fall where they might, the rest of Defendant's evidence was not appreciably more persuasive in any positive sense. The Court, on many issues of fact in this case, has had to *infer* what the truth was. In the face of such a purposeful and broadly based pattern of obfuscation and mendacity as Defendant's witnesses have presented, the Court has often been forced to reason out that the truth was *not* what these witnesses told the Court, usually because, in part, of inferences as to these witnesses' motivations for testifying that the truth of events was something that it clearly was not.

uidated damages, reinstatement and such other relief the Court deems just. For the following reasons the Court will not award liquidated damages, but will order the reinstatement of Plaintiff with attorney's fees and costs.[15]

The policy behind the ADEA is to make whole all victims of age discrimination. *See Arnold v. United States Postal Service,* 649 F.Supp. 676, 684 (D.D.C.1986) (court applied section 633a). Because section 633a does not permit the granting of liquidated damages against the federal government, however, the Court will deny Plaintiff's claim of liquidated damages. *See, e.g., Smith v. Office of Personnel Management,* 778 F.2d 258, 262–63 (5th Cir.1985); *Chambers v. Weinberger,* 591 F.Supp. 1554 (N.D.Ga.1984). However, the Court finds that Plaintiff can be made whole by returning to work.

Section 633a expressly permits federal district courts to grant "such legal or *equitable* relief as will effectuate the purposes of this chapter." 29 U.S.C. § 633a (emphasis added). The Court, therefore, has the power to reinstate Plaintiff. *See, e.g., Miller v. Lyng,* 660 F.Supp. 1375, 1380 (D.D.C.1987) (reinstatement under section 633a); *Loeb,* 600 F.2d at 1022.

The purpose of the ADEA is to "promote employment of older persons based on their ability rather than age" and to "prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621. The Court finds that these purposes would best be met by reinstating Plaintiff. Defendant denied Plaintiff the opportunity to perform the job to the best of his ability. Plaintiff desires, and the Court agrees, that he should have that opportunity.

Because Plaintiff was a probationary employee at the time of his termination, he should continue as a probationary employee until the appropriate probationary period has elapsed.

Accordingly, it is hereby *ORDERED* that judgment be, and it is hereby, entered for Plaintiff. It is further *ORDERED* that Plaintiff be reinstated forthwith to the position he occupied at the time of his termination.

Plaintiff is to recover costs and reasonable attorney's fees upon a proper post-trial showing in respect thereto. Counsel are to move promptly to generate this issue.

---

**15.** While an award of back pay is often necessary to make a victim of discrimination whole, Plaintiff did not seek back pay in his Complaint nor did he provide evidence of these damages at trial. Thus, the Court awards no back pay damages.