336 F.3d 128
 Andrew TERRY, Plaintiff-Appellant,
v.
John ASHCROFT,[1] Attorney General of the United States in his official capacity, Department of Justice of the United States, Individually and in their official capacity, United States Immigration and Naturalization Service, Individually and in their official capacity, Defendants-Appellees,
William Slattery, Individually and in his official capacity, Daniel Molerio, Individually and in his official capacity, Edward McElroy, Individually and in his official capacity, Farrell Adams, Individually and in his official capacity, and Charles Ferrigno, Individually and in his official capacity, Defendants.
 No. 00-6090.
 United States Court of Appeals, Second Circuit.
 Argued: November 6, 2001.
 Decided: July 17, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Eric S. Crusius (Linda M. Cronin on brief), Cronin & Byczek, LLP, Lake Success, New York, for Appellant.
 Nicole L. Gueron, Assistant United States Attorney for the Southern District of New York (Mary Jo White, United States Attorney, and Jeffrey Oestericher, Assistant United States Attorney, on brief) New York, New York, for Appellees.
 Before: KEARSE, MINER, and F.I. PARKER, Circuit Judges.
 F.I. PARKER, Circuit Judge.
 
 
 1
 Plaintiff, Andrew ("Jack") Jackson Terry, a former Special Agent with the Immigration and Naturalization Service ("INS") appeals from a decision of the United States District Court for the Southern District of New York (Naomi Reice Buchwald, Judge) granting summary judgment to defendants. See Terry v. United States, No. 98 CIV. 8249, 2000 WL 204522 (S.D.N.Y. 2000). Terry had alleged that defendants violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et seq., by discriminating against him on the basis of race, gender, and age; by retaliating against him for filing related complaints with the agency's Equal Employment Opportunity ("EEO") office; by creating a hostile work environment; and by eventually constructively discharging him. Terry also alleged that defendants violated his rights under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, alleging that the fact that he was not vested in his pension was a basis for defendants' decision to constructively terminate him. On appeal, Terry argues that defendants were not entitled to summary judgment.
 
 I. BACKGROUND
 
 2
 The facts as largely set forth in the district court's opinion are as follows.
 
 
 3
 Plaintiff, a white male born in 1946, began working for the INS in 1976 at the age of 30 as a Special Agent in the New York District Office, and continued to work for the INS in various positions until 1997.
 
 
 4
 In October 1992, the INS published Vacancy Announcement 92-59 for the position of supervisory criminal investigator ("Vacancy 92-59"). Plaintiff applied for promotion to this vacancy. Lesley Smail, an INS personnel staffing specialist, reviewed candidates' applications and created a "Best Qualified List" ("BQL") which, according to defendants, indicated those candidates who were best qualified for the position. According to INS policy, such lists are sent to the selecting officer who may nevertheless select a candidate who is not listed. Plaintiff was neither placed on the BQL nor selected for the position. Rather, on December 4, 1992, INS New York District Director William Slattery selected Farrell Adams, an African-American male born in 1954 whose name was on the BQL.
 
 
 5
 In response to Adams' selection, Terry filed a complaint with the EEO alleging that race and age-based discrimination were behind the decision not to promote him. Plaintiff alleges that he was wrongfully excluded from the BQL and wrongfully denied promotion due to his race and age, as evidenced by the INS's promotion of a younger black man of allegedly inferior qualifications. Defendants contend that the list was compiled without consideration of race or age, and that Slattery selected Adams because Slattery had been impressed by Adams' performance on a difficult assignment for which Adams had volunteered. Slattery swore under oath that he did not know the names of applicants who were not listed on the BQL.
 
 
 6
 In 1993, the INS published an announcement for Vacancy 93-01 for the position of supervisory criminal investigator ("Vacancy 93-01"). Again plaintiff applied and a "Best Qualified List" was compiled. This time plaintiff's name appeared on the BQL along with those of 14 other employees. Slattery, INS Deputy District Director Edward McElroy, and INS Assistant District Director for Investigations Daniel Molerio reviewed the BQL and selected three other employees: two females under the age of 40, and one white male over 40 who was a few years older than plaintiff.
 
 
 7
 Plaintiff contends that he was denied promotion to Vacancy 93-01 because of his age.[2] In support of this claim, he points to the INS form used to rank candidates (the "Candidates Ranking Form"), apparently compiled by Smail, which shows that he was ranked higher than one of the women promoted. He also testified that Molerio later told him that he would not be promoted because of his age. Specifically, Terry testified that Molerio said to him: "How old are you now? ... Look around you. Everyone else is getting promoted. You're not. Why?"[3] Defendants contend that plaintiff was denied promotion because other employees on the BQL were considered superior and plaintiff was quarrelsome and unexemplary. Terry disputes this characterization, and alleges that he has received written commendations for his "outstanding interpersonal skills."[4]
 
 
 8
 In November 1993, Terry filed a complaint with the EEO alleging that the decision not to promote him to Vacancy 93-01 was discriminatory. In January 1994, plaintiff was hospitalized for chest pains and diagnosed with mitral valve prolapse. The following month he filed a claim for worker's compensation based on his chest pains. Shortly thereafter, Terry attended the "Police Olympics" where he won five gold medals. On June 16, 1994, after learning of Terry's participation in the Police Olympics, Assistant District Director McElroy suspended plaintiff's authorization to carry a firearm and ordered him to undergo a "fitness for duty" medical exam. After undergoing such an exam, Terry was restored to full duty status on August 17, 1994. On September 1, 1994, plaintiff filed an EEO complaint alleging reprisal for his earlier complaints. Less than two months later, plaintiff was reassigned to the Criminal Aliens Section where Farrell Adams was his immediate supervisor. Two days after his reassignment, plaintiff had an altercation with Adams in which he alleges Adams threatened him. The next day, plaintiff was informed by Charles Ferrigno, Chief of the Criminal Alien Processing Section, that he was not allowed to ride in government-owned vehicles.
 
 
 9
 In April 1995, Brian McDonald, a social worker selected by the INS with whom Terry had met,[5] contacted the INS and issued a warning about plaintiff. In an April 23 letter confirming his warning, McDonald listed several INS employees with whom Terry allegedly had a history of conflict, and noted that they "should be mindful of their actions concerning Special Agent Terry." McDonald explained that he breached Terry's right to confidentiality because he had a duty to warn which required such a breach.[6] The following day, the INS placed Terry on paid administrative leave. During plaintiff's leave, Dr. John Pappas twice examined Terry on behalf of the INS to evaluate his fitness for duty, concluding in an October 9, 1996 report that plaintiff was fit for duty. Two months later, on December 17, 1996, the INS advised plaintiff that his paid administrative leave would terminate on January 2, 1997 and that he would be reassigned to the Deportation Branch. Plaintiff contends that the significant delay and reassignment were both retaliation for his EEO complaints.
 
 
 10
 Plaintiff began work with the Deportation Branch on January 2, 1997. In order to perform field work, however, Terry was required to carry a firearm. To do that, he was required to "qualify" on a firing range. Plaintiff claims that when the firearms qualification schedule was posted two weeks later, his name was omitted from the list in retaliation for his EEO complaints.[7] In support of this allegation, he cites a recorded conversation in which his supervisor Ethan Enzer explicitly stated that he had no clearance to send Terry to the range because of Terry's "ongoing pending action."
 
 
 11
 On February 7, 1997, plaintiff went on medical leave to have surgery on his toe, and remained on leave until he "retired" that June. Plaintiff alleges that he was constructively discharged as a result of the hostile treatment he endured during the course of his employment.
 
 II. DISTRICT COURT PROCEEDING
 
 12
 On February 18, 2000, the United States District Court for the Southern District of New York granted defendants' motion for summary judgment on all claims and dismissed Terry's complaint. Judgment was entered on February 24, 2000.
 
 
 13
 In granting summary judgment, the district court found that Terry had not stated a prima facie case of either age or racial discrimination in connection with the failure to promote him to Vacancy 92-59 because he could not demonstrate that he had been excluded from the BQL for a discriminatory reason. The district court credited Smail's testimony that she had not considered age or race in forming the list. In addition, the district court found that even if Terry had established a prima facie case, defendants had offered a legitimate, non-discriminatory rationale for their actions and Terry had not produced evidence sufficient to show that their stated rationale was pretextual.[8] The district court found that Terry had also not stated a prima facie case for discrimination in connection with the failure to promote him to Vacancy 93-01, explaining only that one of the persons selected for that position was a white male who — like Terry — was over the age of 40. In addition, the district court found that defendants had stated a legitimate reason for not choosing Terry because Terry was known to be quarrelsome and uncooperative. The district court did not explicitly address that portion of Terry's original complaint in which Terry alleged that the failure to promote him to Vacancy 93-01 was also the result of gender-based discrimination.
 
 
 14
 The district court also rejected Terry's claim that he was retaliated against for filing EEO complaints. In doing so, the district court discussed a number of discrete instances in which Terry alleged that he had experienced retaliation, and found that none was sufficient to state a prima facie case.
 
 
 15
 As for Terry's hostile work environment claim, the district court found that Terry had merely alleged isolated and sporadic harassment and therefore did not have a hostile work environment claim. The district court indicated that a hostile work environment claim also could not stand because Terry was able to complete his work and remained psychologically healthy.
 
 
 16
 Similarly, the district court found that plaintiff's constructive discharge claim was not actionable because Terry failed to establish that his departure from employment occurred under circumstances giving rise to an inference of discrimination and failed to establish that the acts of which he complained would have compelled a reasonable person to end his employment. The district court concluded that "the incidents plaintiff describes appear to be attributable to personal animosity."
 
 
 17
 Finally, the district court denied plaintiff's demand for punitive damages because "such damages are not available against the government under Title VII."
 
 
 18
 The district court did not explicitly address plaintiff's ERISA claim. However, in dismissing his constructive discharge claim in general, the district court effectively dismissed plaintiff's claim that he was constructively discharged in violation of ERISA.
 
 III. DISCUSSION
 
 19
 This court reviews grants of summary judgment de novo. Scaria v. Rubin, 117 F.3d 652, 653 (2d Cir.1997) (per curiam). Summary judgment is only warranted upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to establish the absence of any material factual issues. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether there are genuine issues of material fact, we are "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Stern v. Trustees of Columbia Univ. in City of New York, 131 F.3d 305, 312 (2d Cir.1997). We may only affirm if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 685 (2d Cir.2001) (internal formatting omitted) (per curiam).
 
 A. Discrimination Claims
 
 20
 To establish a prima facie case of age discrimination under the ADEA, a claimant must demonstrate that: 1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under "circumstances giving rise to an inference of discrimination." See Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir.2001). Similarly, to establish a claim of racial or gender discrimination under Title VII, a claimant must show that: 1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. See Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir.2002). An "adverse employment action" is one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000) (quoting Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir.1993)). Examples of materially adverse changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." Id. (quoting Crady, 993 F.2d at 136).
 
 
 21
 Under either statute, once a plaintiff has established a prima facie case, the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII); Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir.2000) (ADEA). Thus, once the defendant has made a showing of a neutral reason for the complained of action, "to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern, 131 F.3d at 312.
 
 1. Discrimination as to Vacancy 92-59
 
 22
 We find that Terry has presented sufficient evidence to make out a prima facie case of discrimination as to his nonselection for Vacancy 92-59. First, he was a member of a protected group within the meaning of both Title VII and the ADEA as he was allegedly discriminated against on the basis of his race and on the basis of being an age which was over the age of 40.
 
 
 23
 Second, he has shown that he was qualified for the position. It is undisputed that Terry had seventeen years of experience, twenty-seven citations for superior accomplishments and outstanding performance, and a history of positive performance evaluations on a wide range of job elements. By comparison, the individual selected for the position had only four years of experience, only four citations for superior accomplishments and outstanding performance, and had not been evaluated on as many job elements as Terry. In addition, a review of Terry's application for the promotion, suggests that he met the qualifications for the promotion as set in the Vacancy Announcement for the position. Furthermore, the qualifications listed in the announcement for Vacancy 92-59 are virtually identical to those listed in the announcement for Vacancy 93-01; defendants do not dispute that Terry was qualified for Vacancy 93-01, and Terry was placed on the BQL for Vacancy 93-01.
 
 
 24
 The district court nevertheless reasoned that Terry was not qualified because he was not on the Best Qualified List ("BQL") and had failed to show that his exclusion from the BQL was discriminatory. However, there is a genuine issue of material fact as to whether Terry's exclusion from the list was discriminatory. Although defendants contend that the BQL was compiled by someone who did not know Terry's age or race and that the BQL was the sole list of applicants known to those making the final promotion decision, the following handwritten notation appears on Terry's application for the position: "Race: Caucasian."[9] Although there is a factual issue as to who made this notation and when, the presence of the notation would allow a fact-finder to conclude that Smail was not telling the truth when she said that she did not consider race, and that the defendants' stated rationale for the promotion decision was pretextual.
 
 
 25
 Third, Terry suffered an adverse employment action as a result of the decision not to promote him. See Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir.2002) (a refusal to promote constitutes an adverse employment action).
 
 
 26
 Finally, viewing the facts in the light most favorable to the plaintiff, the circumstances under which he was not selected give rise to an inference of discrimination on the basis of race because his application is marked with his race and the position was offered to an allegedly significantly less qualified African-American man. A fact-finder could also conclude that age discrimination was a factor in the decision because the person selected for the position was significantly younger than Terry and Terry testified that Assistant District Director Daniel Molerio, who was at least subsequently involved in similar promotion decisions, indicated to Terry that Terry was too old to be promoted. Terry testified that Molerio said to him "How old are you now? ... Everyone else is getting promoted. You're not. Why?" and "You haven't been promoted. You're not going to be promoted. Look around you. Everybody else is younger than you." While Terry testified that these comments were made several years after Vacancy 92-59 had been filled, the weight to be given these comments is a matter for the jury, which could infer that age was a factor in promotion decisions at the New York District Office.
 
 
 27
 Since a prima facie case has been established, the burden of production shifts to defendants to provide a legitimate, non-discriminatory reason for the refusal to promote Terry. Defendants have stated that Adams, a black male eight years Terry's junior, was promoted because he had performed well on a difficult assignment for which he had volunteered. However, defendants have not provided a reason for excluding Terry from the BQL, or explained why Adams was better qualified than Terry other than that Adams was on the BQL and Terry was not. Accordingly, there is a genuine issue of material fact as to whether defendants have offered a legitimate, non-discriminatory rationale for their actions. Thus, summary judgment should not have been granted to defendants on Terry's discrimination claim stemming from Vacancy 92-59.
 
 2. Discrimination as to Vacancy 93-01
 
 28
 Terry argues that his age was considered by those who made the promotion decisions for Vacancy 93-01.
 
 
 29
 Terry has established a prima facie case of age discrimination as to Vacancy 93-01. As with the prior vacancy, he has provided sufficient evidence to show that he was within a protected age group (i.e., that he was over the age of forty), was qualified for the position,[10] and was not promoted to the position. He has also provided sufficient evidence to show that the circumstances surrounding the promotion decision give rise to an inference of age discrimination. Specifically, handwritten notations as to candidates' birth dates were on a memorandum listing the "Best Qualified" candidates addressed to Slattery, although Slattery stated that the memo he reviewed did not contain any such notations and there is a factual question as to who made the notations and when. If the notations were on the memo at the time Slattery was making his decision, an issue that is for a trier-of-fact to determine, a trier-of-fact could infer that Slattery considered age.
 
 
 30
 In addition, as previously discussed, Terry testified at his deposition that Molerio, who assisted Slattery in deciding whom to promote to Vacancy 93-01, told him in the winter of 1995 or 1996 that he was not going to be promoted and indicated that only younger persons would be. Although Terry testified that these comments were made long after the actual hiring decision was made, a reasonable fact-finder could conclude that they help explain why Slattery, with the assistance of Molerio, made the particular decision he did regarding Vacancy 93-01.
 
 
 31
 We note that the fact that one of the applicants hired instead of Terry was over forty years of age in no way compels the conclusion that Terry was not the victim of age discrimination. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) ("[T]hat one person in the protected class has lost out to another person in the protected class is... irrelevant, so long as he has lost out because of his age.") There is sufficient evidence in the record to raise a triable issue as to whether Terry's age factored into the decision not to promote him.
 
 
 32
 Since Terry has established a prima facie case, the burden shifts to defendants. Defendants have offered a nondiscriminatory reason for the promotion decision, stating that Terry was not promoted because the other applicants were better qualified and because Terry had a reputation for being quarrelsome. Defendants, however, have not come forward with evidence as to what about the other employees made them better qualified; whether or not Terry had a reputation for being quarrelsome is disputed.[11] Accordingly, a reasonable fact-finder could conclude that defendants' stated reason was a pretext for unlawful discrimination. Therefore, summary judgment should not have been granted to defendants.
 
 B. Retaliation Claims
 
 33
 Title VII makes it unlawful for an employer to discriminate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII is violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir.1993). "To establish a prima facie case of retaliation, an employee must show `[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir.1998) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir.1995)). The McDonnell Douglas burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII. See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir.1996). The same standards and burdens apply to claims of retaliation in violation of the ADEA. Schnabel, 232 F.3d at 87 (stating that ADEA claims are analyzed under the same framework as claims brought pursuant to Title VII).
 
 
 34
 Terry contends that his retaliation claim is supported by his evidence of a series of retaliatory acts including: 1) refusal to promote him to Vacancy 93-01; 2) suspension of his firearms privileges; 3) transfer in October 1994 into the unit supervised by Farrell Adams; 4) withdrawal of his vehicle privileges; 5) forced visits with a social worker who worked for the Employee Assistance Program at INS, and Terry's subsequent placement on administrative leave for 1½ years following a warning issued by that social worker; 6) transfer to the Deportation Branch, where his personnel form contained the typed notation "NO PROMOTION POTENTIAL"; and 7) denial of his annual leave time. If Terry can meet his burden as to any one of these instances, then granting summary judgment to defendants on Terry's claim that he was retaliated against for his EEO activity was not proper.
 
 
 35
 Terry's evidence of retaliation includes evidence suggesting that retaliation was commonplace in the New York District Office. For example, INS employee Nancy Diaz testified in her deposition that other INS employees faced retaliation when they complained about unlawful discrimination. In a taped conversation with Terry, Roger Mayo, Terry's one-time supervisor, stated that he too had always worried about experiencing retaliation for his actions and indicated that he was concerned about retaliation if he testified on Terry's behalf regarding the conditions of Terry's employment. Consistent with such an atmosphere, Terry swore under oath that he was informed by Joanne Baldwin, a personnel management specialist, that Slattery "did not look favorably on complaints" and that Baldwin therefore "tried to discourage me from filing ... complaints."
 
 
 36
 1. Alleged retaliatory refusal to promote to Vacancy 93-01
 
 
 37
 In 1993, prior to his application to fill Vacancy 93-01, Terry filed a complaint with the EEO regarding his unsuccessful application for promotion to Vacancy 92-59, charging that Adams was unqualified for the job. The district court found that Terry "produce[d] no evidence that any of the selecting officials who denied him promotion to Vacancy 93-01 were aware of the [previously filed] EEO complaint ...." However, on a memorandum to Slattery listing the Best Qualified Candidates, on which is written each candidate's age and gender, there is also a note indicating "Pending Complaint" by Terry's name and a note indicating "EEO Activity" by the name of another applicant who was denied promotion. Defendants do not provide any explanation for these notations, and there is an open factual question as to when and by whom they were made. The presence of such notations is evidence from which a reasonable trier-of-fact could infer that Terry's "Pending Complaint" was a motivating factor in the promotion decision, particularly when coupled with evidence that other INS employees who reported problems experienced retaliation.
 
 
 38
 The district court found that even if Terry had made out a prima facie case, his claim would fail nevertheless because defendants had provided a legitimate, nondiscriminatory reason for not promoting him: that the other candidates were better qualified. However, the wholly unexplained presence of the notations "EEO action" and "pending complaint" on the list of candidates is sufficient — especially given the evidence of a pattern of retaliatory action in the agency — to create a genuine issue of material fact regarding the pretextual nature of defendants' rationale. Moreover, Terry has put forth sufficient evidence to allow a reasonable fact-finder to conclude that not all of the candidates selected were in fact better qualified. For example, one of the selectees received a lower ranking on the candidates ranking form for Vacancy 93-01 than Terry did.[12] Accordingly, summary judgment was improper on Terry's retaliation claim based on his non-promotion to Vacancy 93-01.
 
 
 39
 2. Alleged retaliatory suspension of firearms privileges
 
 
 40
 Terry alleges that his firearms privileges were denied to him in retaliation for his EEO complaints.
 
 
 41
 In June 1994, a number of months after his January 1994 hospitalization for chest pains and related problems, Terry's firearms privileges were suspended and Terry was ordered to undergo a fitness-for-duty medical exam. According to defendants, the privileges were suspended pending the outcome of the medical exam and Terry's return to full duty status.[13] On August 17, 1994, Terry was restored to full duty status and defendants imply (but never state) that Terry regained his firearms privileges at that time. Terry, however, asserts that he never received re-authorization to carry a firearm.
 
 
 42
 According to Terry, this lack of authorization became a particular problem when, in January 1997, he returned to work after a 1½ year administrative leave and was placed in the Deportation Branch. He alleges that Deportation Agents working in the field were required to carry a firearm. To be allowed to carry a firearm, Terry needed to qualify at a shooting range.[14] In a taped telephone conversation, Terry's immediate supervisor, Ethan Enzer, explicitly stated that he had no clearance to send Terry to the range because of his "ongoing pending action," apparently referring to Terry's EEO activities.
 
 
 43
 Terry has stated a prima facie case of retaliation. See Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir.1999). First, he has shown that he participated in a protected activity known to his employer. Second, a reasonable fact-finder could conclude that the suspension of Terry's firearms privileges constituted an adverse employment action. Terry's deposition suggests that a firearm may well be an essential tool for a Special Agent, and that the lack of one for a significant period of time could limit the types of assignments an Agent may take and, therefore, limit the development of the Agent's career. Third, Terry has presented sufficient evidence for a trier-of-fact to conclude that there was a causal connection between the protected activity and the adverse decision. Enzer's statement supports the conclusion that such a connection existed between the refusal to allow Terry to qualify and his EEO activity. The existence of a retaliatory refusal to allow Terry to regain his privileges would in turn support the inference that the original suspension was retaliatory as well.
 
 
 44
 Terry has also provided sufficient evidence to show that defendants' stated reasons for the original suspension and the refusal to allow him to qualify were pretextual. First, insofar as Terry can show that his firearms privileges were never reinstated, a reasonable fact-finder might infer that defendants' reason for suspending them in 1994 (that Terry was diagnosed with chest pains and Mitral Valve Syndrome) were pretextual, because his privileges were not reinstated even after he subsequently passed a medical exam and was reinstated as fit-for-duty. Second, while defendants claim that no adverse action was taken against Terry because no member of the Branch was allowed to go to the range until February, and thus Terry was not singled out,[15] Enzer's statements could be read as indicating that the only reason Terry was not allowed to go to the range earlier was because of his EEO activity.
 
 
 45
 Thus, summary judgment on Terry's retaliation claim stemming from denial of his firearms privileges was inappropriate.
 
 
 46
 3. Alleged retaliatory transfer in October 1994
 
 
 47
 On October 11, 1994, when Terry returned from a nearly three-month-long medical leave, he was transferred to the Criminal Aliens Section, the INS unit supervised by Farrell Adams. Terry alleges that this transfer was in retaliation for his EEO complaints and points to a tape recorded phone conversation he had in 1999 with Roger Mayo, Terry's supervisor before the transfer. In that conversation, Terry asked Mayo why he was transferred and Mayo responded that, "My belief is that they were trying to screw you." In his subsequent deposition, Mayo downplayed the comment, explaining that by "screw" he had meant "discipline", and that the transfer had been an attempt to discipline Terry by placing him under Adams who was thought to be a tougher supervisor than Mayo.
 
 
 48
 Defendants respond that the transfer was not retaliatory because it occurred two years after Terry made an EEO complaint in June of 1993 concerning his non-selection for Vacancy 92-59. This ignores the fact that Terry had filed other EEO complaints in November 1993 and September 1994, and that — given that Terry was on leave when he filed the latter and October 11 was apparently his first day back — it would not have been possible to subject him to a retaliatory transfer for that complaint at any earlier point in time. Defendants also contend that Mayo's comments merely indicated that the transfer was a form of discipline. However, even assuming that this was the case, it does not show a lack of retaliation, as discipline can be retaliatory if done to punish an individual for complaining. Thus, Terry has presented sufficient evidence for a trier-of-fact to conclude that the transfer was in retaliation for his EEO activity.
 
 
 49
 Terry has also presented sufficient evidence for a trier-of-fact to conclude that the transfer was an "adverse employment action." An internal transfer can be an adverse employment action if "accompanied by a negative change in the terms and conditions of employment." Morris v. Lindau, 196 F.3d 102, 113 (2d Cir.1999). In Richardson, 180 F.3d at 444, we held that a plaintiff had sufficiently alleged an adverse employment action when she testified that she believed the defendant had transferred her to a different position "in the hopes that she would quit." Similarly, Terry alleges that the INS transferred him into Adams's unit with the intent to harass him, and has put forth evidence sufficient to permit a trier-of-fact to conclude that his supervisors believed that he would find the new assignment to be adverse. Indeed, even defendants' proffered reason — that the transfer was intended to "discipline" Terry — suggests that the INS supervisors who ordered the transfer perceived it as adverse. Terry clearly also felt it to be adverse and within two days of starting in Adams' unit, Terry was having personal problems with Adams.
 
 
 50
 Since Terry has put forth sufficient evidence for a trier-of-fact to conclude that his transfer was a retaliatory, adverse employment action, and since the defendants' proffered rationale of "discipline" is consistent with a retaliatory motive, summary judgment was not appropriate.
 
 
 51
 4. Alleged retaliatory withdrawal of vehicle privileges
 
 
 52
 On October 14, 1994, three days after Terry returned to work from medical leave and found himself assigned to Adams' unit, he was told he could no longer ride in a government car.[16] Terry claims that this prohibition was retaliatory. Defendants respond that there was no nexus between Terry's EEO activity and his vehicle suspension. Defendants claim that Terry's vehicle privileges were legitimately suspended because it was INS policy that government vehicles are only issued to persons who are on full duty, and that Terry was on "light duty" through January 9, 1994 on his doctor's orders. Terry counters that this action was retaliatory. He alleges that defendants were aware that he was able to successfully engage in activities requiring significant physical exertion because they knew he had excelled at the Police Olympics. In addition, he testified that no other ill agents were prohibited from riding in government cars. Consistent with this testimony, Ferrigno admitted at his deposition that he could not recall a single other instance in the 21 years he had worked for the INS in which an employee had not been allowed to ride in a government-owned vehicle because of his or her illness. This court fails to see any rational relationship between Terry's "light duty" status and the prohibition against his riding in a government-owned vehicle, and the defendants have failed to explain how a potential heart condition made it any less appropriate for Terry to merely sit in a moving car.[17] Moreover, the only evidence of a policy similar to that which defendants claim existed is Molerio's affidavit which states that government vehicles are only issued to persons of full duty status. However, the question before us is not whether a failure to issue Terry a vehicle could be seen as retaliatory, but rather whether the failure to even allow him to ride in one could be seen as retaliatory. Defendants have failed to put forth evidence of a policy which would support the prohibition against merely riding in government-owned vehicles.
 
 
 53
 Even if this court were to accept the defendants' explanation as legitimate, Terry has put forth sufficient evidence to support a finding that it was merely pretextual. First, the suspension occurred one day after a verbal altercation between Terry and Adams at which, according to Terry's affidavit, Adams allegedly told Terry that "we'll take care of you tomorrow." Second, defendants fail to explain why the vehicle suspension apparently continued after Terry returned to full duty status.
 
 
 54
 Finally, defendants assert that the vehicle suspension could not be an adverse employment action. A reasonable trier-of-fact, however, could conclude that the inability to ride in a government-owned vehicle was a sufficiently adverse employment action where it would require plaintiff to undertake an allegedly much more taxing commute than would otherwise have been possible and where it appears that to fully engage in his new position Terry would have had to perform field work.
 
 
 55
 Because sufficient evidence was presented to create a genuine issue of material fact as to whether the prohibition against riding in a government vehicle was retaliatory, granting summary judgment to defendants on plaintiff's retaliation claim was improper.
 
 
 56
 5. Alleged retaliatory requirement to see a social worker, and resulting placement on administrative leave for 1½ years
 
 
 57
 Terry alleges that he was forced to see social worker Brian McDonald in retaliation for his EEO complaints. He further alleges that the "Tarasoff" warning issued by McDonald and his subsequent placement on administrative leave for 1½ years also resulted from a retaliatory motive.
 
 
 58
 The first allegation is wholly unsupported because Terry presents no evidence that defendants ever required him to meet with McDonald. The second allegation, however, is supported by evidence and should be heard by a trier-of-fact.
 
 
 59
 Contrary to the district court's conclusion, Terry has presented sufficient evidence for a trier-of-fact to conclude that there was a causal connection between his complaints and his placement on administrative leave. The district court stated that there was a lapse of over six months between when plaintiff filed an EEO complaint in September 1994 and when he was placed on leave. However, Terry's complaint alleges that he also filed an EEO complaint in February 1995, slightly less than three months before being placed on administrative leave. Moreover, reviewing the evidence in the light most favorable to Terry, it appears that there was no meaningful lag time between his EEO activity and the onset of frequent harassment,[18] and a series of other retaliatory acts.
 
 
 60
 Also contrary to the district court's conclusion, Terry has presented sufficient evidence to permit the inference that defendants' stated rationale — i.e., the seriousness of a Tarasoff warning — was pretextual. Specifically, Terry has presented evidence that would allow a reasonable fact-finder to conclude that the warning was not credible, and that Terry's supervisors knew that it was not. Evaluating Terry some months later, Dr. Pappas stated that:
 
 
 61
 It is also my opinion, based on Mr. McDonald's lack of cooperation with this evaluation, that his Tarasoff Warning does not appear to be credible and germane to Mr. Terry's current functioning. Of particular significance, is that Mr. Terry never made any specific threats towards any individual, nor did he articulate any plan to carry out any harm against any individual. This information was ... verified by Mr. McDonald.
 
 
 62
 Consistent with this assessment, Terry testified that the warning was not the result of any threat he posed, but rather the result of pressure placed on McDonald by the INS which caused McDonald to compromise his professional integrity and declare Terry to be a threat. Terry testified that McDonald acknowledged to Terry that he knew the INS was "after" Terry and that the INS would "go to great lengths" to "get" him. Terry also testified that McDonald told him that he had never seen so much INS paperwork about one person, and stated "If I could, I would like to see you in a one-man office out in Montauk Point looking for German submarines." Terry testified that he interpreted this statement as indicating that McDonald thought Terry was in some danger. Assuming that McDonald so testified at trial or that Terry's statements as to what McDonald said to him are admissible despite the hearsay rule, such statements might well make a reasonable fact-finder skeptical of the reasons offered by defendants for Terry's placement on administration leave.
 
 
 63
 Since Terry thus presented sufficient evidence to create a genuine issue of material fact as to whether his placement on administrative leave was in retaliation for his EEO complaints, summary judgment on plaintiff's retaliation claim was improper.
 
 
 64
 6. Alleged retaliatory transfer to the Deportation Branch and accompanying "no promotion potential" notation in his file
 
 
 65
 Terry contends that his transfer to the Deportation Branch when he returned from his lengthy administrative leave was a demotion. Terry alleges his new position was less prestigious and less glamorous than his previous position. He also complains that the transfer was accompanied by poor working conditions, including a failure to issue him any credentials or a badge, failure to initially give him a computer password or to give him computer training, and failure to provide him with either a desk or a workspace for his first two weeks in the position. Terry also claims that he was given low-level ministerial work which was unlike that assigned to other deportation officers. Finally, he notes that his transfer form contained the typed notation "NO PROMOTION POTENTIAL."
 
 
 66
 Defendants respond by setting forth a non-discriminatory reason for transferring Terry out of the Investigations Branch: a recommendation from Dr. Pappas that Terry not work under supervisors with whom he'd had conflicts in the past. Since Molerio was one of those supervisors and was also the indirect supervisor of every special agent in the Investigations Branch, defendants claim that in transferring Terry to the Deportation Branch, the INS was merely following Pappas' recommendation.
 
 
 67
 Terry, however, has produced sufficient evidence for a reasonable fact-finder to conclude that this rationale is merely pretextual. Specifically, Terry's evidence suggests that his supervisors transferred him in order to induce him to resign. Terry swore under oath that upon arriving at the deportation office, he spoke with his new supervisor who informed him that she had no idea that he had been reassigned to her office. According to Terry's affidavit, she then called Robert Bronillet, a personnel management supervisor at the district office, who stated: "you mean to say he really showed up?"
 
 
 68
 By comparison, we find that Terry has failed to show that the "no promotion potential" notation on his personnel form was itself retaliatory. Defendants explained that the INS routinely uses such notations when an employee has reached the top of the promotional ladder for the position he or she currently holds and can no longer be promoted non-competitively within that position. Terry has not provided any evidence to the contrary, nor has he alleged that he would have been eligible to receive non-competitive promotions in his former position.
 
 
 69
 Since we find that a genuine issue of material fact exists with respect to whether the transfer was retaliatory, although not as to whether the promotion notation was retaliatory, summary judgment on plaintiff's retaliation claim was not proper.
 
 
 70
 7. Alleged retaliatory denial of annual leave time
 
 
 71
 Although not discussed in the district court's opinion, Terry testified in his deposition that because he was put on administrative leave, he was not able to use his 1996 annual leave time. He testified that he therefore requested that this leave time be "restored" so that he could use it later. This request was denied. Terry alleges that this denial was in retaliation for his refusal to quit in response to being reassigned to the Deportation Branch. Consistent with this allegation, Terry testified that he was able to restore his 1995 annual leave time and that defendants never indicated that there had been a change in policy or practice.
 
 
 72
 The denial of restoration of lost leave time is not sufficient to support a retaliation claim, however, as it is legally insufficient to constitute an adverse employment action. By the time Terry was informed of the denial on February 28, 1997, he was no longer working as he was on medical leave. He never returned to work, allegedly because he was constructively discharged. Therefore, there is no reason to believe that Terry would ever have had the opportunity to use his annual leave time had it been granted.[19]
 
 
 73
 That the denial of annual leave is not sufficient to support a retaliation claim is, however, of little practical consequence to Terry because his other evidence of retaliation is more than sufficient to defeat summary judgment.
 
 C. Hostile Work Environment Claim
 
 74
 In order to prevail on a hostile work environment claim under Title VII, a plaintiff must show that "the harassment was `sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Alfano v. Costello, 294 F.3d 365, 373 (2d Cir.2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997));[20] see also Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (stating that a hostile work environment is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"). We have explained that "[t]his test has objective and subjective elements: the misconduct must be `severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Alfano, 294 F.3d at 374 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Among the factors to consider when determining whether an environment is sufficiently hostile are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23, 114 S.Ct. 367. In determining whether a hostile environment exists, we must look at the "totality of the circumstances." Richardson, 180 F.3d at 437-38. "As a general rule, incidents must be more than `episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Alfano, 294 F.3d at 374 (quoting Perry, 115 F.3d at 149). The same standards apply to hostile work environment claims brought under the ADEA. Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir.1999).
 
 
 75
 While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether `the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir.2000) (quoting Torres v. Pisano, 116 F.3d 625, 632 (2d Cir.1997)). The environment need not be "unendurable" or "intolerable." Id. Nor must the victim's "psychological well-being" be damaged. Fitzgerald v. Henderson, 251 F.3d 345, 358 (2d Cir.2001). In short, "`the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.'" Whidbee, 223 F.3d at 70 (quoting Torres, 116 F.3d at 631).
 
 
 76
 Terry alleges that acts discussed previously in this opinion in relation to his retaliation claim, along with a number of other incidents, created a hostile work environment. For example, he also presents evidence that Adams told his co-workers not to speak to Terry; that his supervisors told co-workers that Terry was "nuts," having a nervous breakdown, suffered from "emotional problems," and had made threats against INS employees; and that Ferrigno broke into Terry's desk and purposefully discarded some of Terry's personal belongings in order to harass him.
 
 
 77
 Defendants respond that these events were too sporadic and isolated to create a hostile work environment, that Terry admitted in his deposition that he did not perceive Adams's treatment of him as severe or pervasive and that it did not interfere with his work, and that there is no evidence that the treatment Terry complains about was motivated by his race or age.
 
 
 78
 By contrast, we find that Terry has set forth sufficient evidence to permit the inference that he suffered from a hostile work environment. First, Terry has alleged facts sufficient to find that the conduct of which he complains was pervasive. While each incident on its own may not have been particularly severe, we have explained that "a work environment may be actionable if the conduct there is either so severe or so pervasive as to alter the working conditions of a reasonable employee." Richardson, 180 F.3d at 440. To the extent that the district court suggested that conduct must always be both severe and pervasive to be actionable under a hostile work environment theory, it was therefore mistaken.
 
 
 79
 Contrary to defendants' assertions, plaintiff is not complaining merely about sporadic and isolated events, but rather about his daily working conditions. Terry claims — and his co-worker Agnes Black so testified at her deposition — that Adams and other INS supervisors purposefully harassed Terry and made his work environment unusually and unnecessarily unpleasant on a nearly daily basis. Indeed, Black testified that "the actions that [Adams] took against Mr. Terry on a daily basis" led her to conclude that "Adams lived to make Jack Terry's life hell on Earth." Black testified that there were "several incidences" when she was told not to speak to Terry; that on one such occasion she was attempting to discuss an INS case with Terry when Adams "came running out of his booth and ordered me away from [Terry]" and "told me under no circumstances was I to talk to Jack Terry"; that on another occasion Terry summoned Black to his desk, and she observed "Mason Rhuelen [sic], who was then a supervisor, Farrell Adams, and Charles Ferrigno standing around his desk and all of them had their fingers pointing at him"; and that "at least on a weekly basis," Ferrigno "had his forefinger pointing in Jack Terry's face, standing at his desk yelling at him".
 
 
 80
 Second, a reasonable fact-finder crediting Terry's testimony could find that the harassment was sufficiently severe or pervasive to alter the conditions of Terry's employment and to create an abusive working environment. Defendants argue that Terry failed to show that he subjectively experienced a hostile work environment because he admitted in his deposition that he was still able to do his job despite the alleged harassment. Defendants' suggestion that a hostile work environment claim cannot stand where a plaintiff is still able to successfully perform the basic functions of his or her job is without merit. See Whidbee, 223 F.3d at 70. The question, rather, is whether the conditions under which those tasks must be performed have been altered for the worse. Id. Whether or not the harassment interferes with an employee's ability to work is merely one factor to be considered when looking at the totality of circumstances to determine whether a hostile work environment has been created. Moreover, we note that Terry has claimed that certain forms of the harassment (e.g., denial of firearms privileges) directly interfered with his ability to perform his job.
 
 
 81
 Third, Terry has alleged facts sufficient to allow a fact-finder to conclude that defendants' alleged hostility was based on a prohibited factor. For example, Terry's co-worker Agnes Black testified that Adams "race-baited" and that he treated white employees with contempt, but was warm with non-white employees. Assuming that Black describes such statements or conduct at trial, a reasonable fact-finder could conclude that race was a motivating factor in the harassment. Similarly, a reasonable fact-finder could conclude, based on the evidence, that a retaliatory motive played a role in the creation of a hostile work environment. As discussed previously, a reasonable fact-finder could conclude that a number of discrete adverse employment actions—from placement on leave to denial of firearms privileges—were motivated by retaliatory intent. As this court recognized in Cruz v. Coach Stores, Inc., 202 F.3d 560 (2d Cir.2000), one type of hostility can exacerbate the affect of another. Id. at 572. Here, hostile racial attitudes could have exacerbated the affect of retaliation-based or age-based hostility and vice versa.
 
 D. Constructive Discharge Claim
 
 82
 Terry alleges that his eventual "retirement" was in fact a constructive discharge.
 
 1. Timeliness
 
 83
 Defendants argue that the constructive discharge claim is not timely because Terry failed to exhaust available administrative remedies in a timely fashion. Defendants presume that if Terry was constructively discharged, Terry's constructive discharge arose from his reassignment to the Deportation Branch in 1997.
 
 
 84
 It is true that Terry failed to bring an EEO claim as to either constructive discharge or the transfer to the Deportation Branch within the specified time period. Under 29 C.F.R. § 1614.105, Terry was required to bring complaints of discriminatory treatment to the agency's EEO office within 45 days of the alleged discriminatory act.[21]
 
 
 85
 The requirement that a claim be first raised with the EEO office, however, is not a jurisdictional one. Boos v. Runyon, 201 F.3d 178, 183 (2d Cir.2000). As the Supreme Court has stated, "filing a timely charge of discrimination with the EEOC is ... a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); see also Briones v. Runyon, 101 F.3d 287, 290 (2d Cir.1996).
 
 
 86
 This court has treated the requirement that a federal employee bring a complaint to his or her EEO for resolution, see 29 C.F.R. § 1614.105, as analogous to the requirement that a private sector employee first bring a complaint to the attention of the Equal Employment Opportunity Commission ("EEOC") for resolution. See Fitzgerald v. Henderson, 251 F.3d 345, 359-60 (2d Cir.2001) (treating the requirement that a plaintiff exhaust her administrative remedies by bringing a complaint to an EEO office as identical to a requirement that a private claimant exhaust administrative remedies provided by the EEOC).
 
 
 87
 Where there exists a requirement that a Title VII claim first be presented to the federal EEOC, we have recognized three situations in which claims not raised in an EEO charge are "sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action": 1) where "the conduct complained of would fall within the `scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination'"; 2) where the complaint is "one alleging retaliation by an employer against an employee for filing an EEOC charge"; and 3) where the complaint "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1402-03 (2d Cir.1993) (superceded on other grounds); see also Alfano, 294 F.3d at 381. As the administrative exhaustion requirement is the same under the ADEA as it is under Title VII, we find that such exceptions also apply to claims brought pursuant to the ADEA.
 
 
 88
 Here, Terry's claim falls within at least the second exception.[22] Terry contends that his discharge was due, at least in part, to defendants' "retaliatory conduct," and most of the incidents which Terry cites as providing the basis for his constructive discharge claim, he had previously alleged were done to retaliate against him for his EEO complaints. As such, Terry's EEO complaints prior to the transfer were sufficient to exhaust his administrative remedies. Indeed, to not allow such an exception would have the perverse result of rewarding the most egregious forms of retaliation. The more effective an employer was at using retaliatory means to scare an employee into not filing future EEO complaints, the less likely the employee would be able to hold the employer liable for that retaliation because the less likely the employee would risk filing an EEO complaint as to the retaliation. In addition, requiring a separate EEO filing "could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination." Butts, 990 F.2d at 1402.
 
 
 89
 2. Waiver of claim of constructive discharge in violation of ERISA
 
 
 90
 In his original complaint, Terry claimed that defendants violated his rights under ERISA, 29 U.S.C. § 1140, alleging that the fact that he was not vested in his pension was a basis for defendants' decision to constructively terminate him. As discussed previously, the district court did not explicitly address plaintiff's ERISA claim. However, in dismissing his constructive discharge claim in general, it also dismissed plaintiff's claim that he was constructively discharged in violation of ERISA.
 
 
 91
 Terry's brief on appeal does not mention his ERISA claim, nor does it anywhere discuss his theory that the fact that his pension had yet to vest was a basis for the defendants' decision to constructively terminate him. Nor was the ERISA claim raised at oral argument. Accordingly, Terry has waived his right to pursue this claim.
 
 3. Evidence of constructive discharge
 
 92
 An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily. Kirsch v. Fleet St., Ltd., 148 F.3d 149, 161 (2d Cir.1998); Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir.1996). We have explained that working conditions are intolerable when, viewed as a whole, they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Chertkova, 92 F.3d at 89 (quotations omitted). In addition, to state a prima facie case of constructive discharge, Terry must establish that the constructive discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of [his] membership in [a protected] class." Id. at 91. Proof of such a causal connection "can be established `directly through evidence of retaliatory animus directed against a plaintiff,' or `indirectly by showing that the protected activity was followed closely by discriminatory treatment ... through other evidence such as disparate treatment of fellow employees who engaged in similar conduct.'" Richardson, 180 F.3d at 444 (quoting DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir.1987)).
 
 
 93
 We find that Terry has presented sufficient evidence to allow a reasonable fact-finder to conclude that a reasonable person in Terry's position would have felt compelled to terminate his employment. First, as discussed previously, Terry has made a sufficient showing for a reasonable trier-of-fact to find that Terry was experiencing a hostile work environment which involved pervasive, unabated harassment by his supervisors. Second, Terry testified that Adams told him that "your days are numbered" and that Molerio told him that his "life's over with" and that "you're going to be brought up on more charges." Such comments would allow a reasonable person to infer that he was not wanted as an employee and that he was going to be forced out of the INS's employment. In addition, as mentioned previously, Terry alleges that upon arriving at the deportation office, he spoke with his new supervisor who informed him that she had no idea that he had been reassigned to her office, and that when she contacted Robert Bronillet, a personnel management supervisor at the district office, about the matter, he responded by stating: "you mean to say he really showed up?" The import of these comments is not only in the words themselves, but in how a reasonable person in Terry's position might have viewed them in conjunction with the other circumstances of his employment, and whether such a person would have felt compelled to resign as a result. See generally, Chertkova, 92 F.3d at 89-90 (discussing similar comments). Finally, Terry's co-worker Agnes Black testified that it was her opinion, based on her observations and experience, that Adams was trying to make "Terry's life so miserable he would quit", and presumably she would be able to explain the specific basis for this opinion at trial.[23]
 
 
 94
 Second, we find that Terry has put forth sufficient evidence to allow a trier-of-fact to conclude that the constructive discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in a protected class. Terry does not allege that just a single event caused him to be constructively discharged, but rather that such a discharge resulted from the cumulative, unabated harassment that he experienced.[24] As discussed previously, Terry has set forth sufficient evidence for a reasonable fact-finder to conclude that Terry experienced pervasive harassment in retaliation for his EEO complaints.
 
 
 95
 Since Terry has put forth sufficient evidence for a trier-of-fact to conclude that a reasonable person would have felt compelled to leave his job, and that the conditions that would have resulted in such compulsion were the result of an improper motive, summary judgment should not have been granted to defendants on Terry's claim of constructive discharge in violation of Title VII and the ADEA.
 
 E. Punitive Damages
 
 96
 The district court denied Terry's demand for punitive damages under Title VII. The district court was correct in concluding that punitive damages are not available under Title VII. See 42 U.S.C. § 1981a(b)(1) (prohibiting awards of punitive damages against the federal government); Tomka v. Seiler Corp., 66 F.3d 1295, 1313-15 (2d Cir.1995) (holding that "individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII" and stating that "it appears that Congress contemplated that only employer-entities could be held liable for compensatory and punitive damages" under Title VII).
 
 
 97
 We note that the district court did not pass on the closely related issue of availability of "liquidated damages" under the ADEA. C.f. McGinty v. New York, 193 F.3d 64, 70-71 (2d Cir.1999) ("ADEA's added liquidated damages may fairly be characterized as `punitive in nature,' . . . they do after all provide an ADEA victim with more than his or her out-of-pocket damages or any other strictly compensatory amounts.") Given the preliminary posture of this case and the lack of briefing on the issue, we express no view on the availability of such damages.[25]
 
 IV. CONCLUSION
 
 98
 For the reasons stated above, we VACATE the district court's grant of summary judgment on Terry's ADEA claims and his Title VII claim except in so far as it is premised on gender-based discrimination, and REMAND for further proceedings on those claims consistent with this opinion. However, we AFFIRM the district court's grant on summary judgment on Terry's ERISA claim. We also AFFIRM the district court's decision as to the unavailability of punitive damages under Title VII. Finally, we award costs on appeal to plaintiff-appellant.
 
 
 
 Notes:
 
 
 [1]
 John Ashcroft became the United States Attorney General effective February 2001, to succeed Janet Reno. Under Fed.R.Civ.P. 25(d)(1), Ashcroft is automatically substituted as a defendant in this action
 
 
 [2]
 In his original complaint, Terry alleged that gender was also a motivating factor in the decision not to promote him to vacancy 93-01. However, on appeal Terry does not raise this allegation, choosing instead to limit his claim to discrimination on the basis of age. Accordingly, Terry has waived any argument that the failure to promote him to that position was motivated by gender-based discriminatory intent. Notably, the district court also did not discuss the gender-based allegation in Terry's original complaint
 
 
 [3]
 There are several different recollections of this conversation by Terry in the record. Another description is as follows: "I was told by Molerio in this stairwell ... look at you, you're almost — I don't know what he said at that time — I guess I was in my late forties at that time. You're never going to be promoted. You're forty something. You're never going to be promoted. Look around. Look who is being promoted. People who don't have your credentials, your education, your background, you know."
 
 
 [4]
 These alleged commendations, however, are not in the record before this court
 
 
 [5]
 It is not clear from the record exactly what precipitated these visits, but some years earlier in 1990 Terry had explicitly requested that the INS provide him with mental health assistance
 
 
 [6]
 Specifically, McDonald stated that he made a "Tarasoff Decision." The terms "Tarasoff decision" or "Tarasoff warning" are derived from the landmark caseTarasoff v. Regents of Univ. of California, 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976), in which the California Supreme Court held that when a psychotherapist determines that his or her patient poses a serious danger of violence to a specific person, the psychotherapist has a duty to use reasonable care to protect the likely victim which may require him to warn that individual.
 
 
 [7]
 Defendants maintain that the entire Deportation Branch was not listed on that schedule, and that therefore Terry was not singled out
 
 
 [8]
 The district court erroneously suggested that Terry's only evidence of discrimination in the Vacancy 92-59 promotion decision was Terry's subjective belief that he was more qualified. The district court also stated that no derogatory comments about race or age were alleged, and suggested that derogatory comments are necessary to show pretext. We note that we have never held that derogatory comments are required to show pretext, although certainly such comments might be evidence of pretext
 
 
 [9]
 Defendants argue that plaintiff's argument that the Caucasian notation is evidence of discrimination is mistaken because the personnel specialist who compiled the list averred that she did not know the race of any of the applicants before creating it. Defendants contend that plaintiff has not introduced evidence contradicting this averment. To the contrary, the notation itself is evidence that a reasonable trier-of-fact could find to be contradictory of the personnel specialist's version of the facts
 
 
 [10]
 The fact that he was placed on the BQL for the position also indicates that the INS believed him to be at least minimally qualified
 
 
 [11]
 Of course, if Terry's alleged reputation for being quarrelsome were shown to be based on his tendency to file non-frivolous EEO complaints, the existence of such a reputation could not be a legitimate, non-discriminatory rationale for not promoting him
 
 
 [12]
 We note that the fact that Terry's EEO complaint might not have been the only reason why he was not hired does not change our analysisSee Desert Palace, Inc. v. Costa, ___ U.S. ___, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir.2000).
 
 
 [13]
 The record does not contain any evidence of an INS policy requiring or recommending such a suspension
 
 
 [14]
 The record does not contain any evidence as to the existence or nature of INS policies regarding firearm qualification requirements
 
 
 [15]
 The district court inexplicably credited this version of events even though Terry had offered evidence that the only reason he was not allowed to go to the range was his "ongoing pending action."
 
 
 [16]
 Charles Ferrigno, Chief of the Criminal Aliens Processing Section, allegedly explained the restriction to Terry as follows: "you need to take public transportation to the office. In other words, you cannot hitch a ride with other agents."
 
 
 [17]
 While the defendant's burden is "one of production, not persuasion" and therefore this court cannot undertake a credibility assessment, the defendant must offer evidence sufficient for the trier-of-fact to conclude that the proffered reason was the actual cause of the complained of adverse actionSee Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).
 
 
 [18]
 This alleged harassment is discussed in depth in section III(C) infra
 
 
 [19]
 There is no indication in the record that such leave time could have been "cashed out" upon the termination of Terry's employment
 
 
 [20]
 To prevail on a hostile work environment claim against the INS, Terry must also show that there is a specific basis for imputing the conduct he complains of to the INSRichardson, 180 F.3d at 440-41. However, an employer is presumed to bear absolute liability in cases where, as here, the harassment is perpetrated by the victim's supervisor, although an employer may interpose an affirmative defense to rebut that presumption. Id. Since Terry maintains that the harassment was perpetrated by his supervisors, and the INS has offered no such defense, Terry has satisfied the requirement that he show a specific basis for imputing the conduct to the INS.
 
 
 [21]
 The assignment to the Deportation Branch was made December 17, 1996 and Terry began work on January 2, 1997. Defendants urge that the EEO complaint for constructive discharge should have been filed within 45 days, either by January 31, 1997 or, at the latest, by February 17, 1997. However, after that assignment, Terry did not file a claim of discriminatory retaliation and harassment until April 2, 1997, and did not file one for constructive discharge until March 20, 1998
 
 
 [22]
 We therefore need not consider whether the other exceptions might apply
 
 
 [23]
 We note that the mere fact that Adams was no longer Terry's direct supervisor at the time Terry's employment ended does not mean that a reasonable fact-finder could not conclude that his actions contributed to Terry's alleged constructive discharge
 
 
 [24]
 This is sufficient to state a valid claim for constructive discharge. InChertkova, 92 F.3d at 90, we recognized that a constructive discharge claim can be premised on the cumulative affect of a number of adverse conditions in the workplace.
 
 
 [25]
 Several courts have held that such damages are not available against the federal governmentSee Smith v. Office of Pers. Mgmt., 778 F.2d 258 (5th Cir.1985); Gibbons v. Burnley, 737 F.Supp. 1217 (D.Me.1990); Grandison v. United States Postal Serv., 696 F.Supp. 891, 896 (S.D.N.Y.1988).