Tommy HUNTER, Plaintiff,

v.

ST. FRANCIS HOSPITAL, Defendant.

No. 02–CV–528(TCP)(WDW).

United States District Court,
E.D. New York.

Aug. 20, 2003.

536

Alan E. Wolin, Wolin & Wolin, Esqs., Jericho, for Tommy Hunter, Plaintiff.

Joseph Cartafalsa, Putney, Twombly, Hall & Hirson LLP, New York, for St. Francis Hospital, Defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Before this Court is a motion for summary judgment by defendant St. Francis Hospital ("Hospital" or "Defendant") to dismiss the Complaint of plaintiff Tommy Hunter ("Hunter" or "Plaintiff") in its entirety pursuant to Fed.R.Civ.P. 56. The Court heard oral argument on the motion on July 26, 2003.

Plaintiff first filed a complaint with the New York State Division of Human Rights ("State Division" or "SDHR") on or about June 16, 1998, alleging race discrimination under Title VII of the Civil Rights' Act of 1964 ("Title VII"), age discrimination under Age Discrimination in Employment Act ("ADEA"), and race and age discrimi-

nation under the New York State Human Rights Law. In January 2000, while his first complaint was still pending, Plaintiff filed a second complaint with the SDHR alleging race/age discrimination and retaliation under federal and state law. In September 2001, the State Division dismissed both complaints upon finding "NO PROBABLE CAUSE" of discrimination/retaliation. (Cartafalsa Aff., Ex. D.)

Plaintiff instituted the instant action in January 2002. The Complaint alleges: (i) race discrimination under Title VII; (ii) age discrimination under the ADEA; (iii) race discrimination and hostile work environment under 42 U.S.C. § 1981 ("Section 1981"); and (iv) retaliation under Title VII.

Defendant now moves for summary judgment on the grounds that: (i) Plaintiff cannot establish a *prima facie* case of race or age discrimination, because there was no adverse employment action occurring under circumstances giving rise to an inference of discrimination; (ii) Plaintiff cannot establish a *prima facie* case of retaliation because the Plaintiff was treated consistently during his entire term of his employment; and (iii) Plaintiff has not shown that Defendant's proffered reasons for their actions are a pretext for discrimination or retaliation. Defendant further argues that there is no evidence to support a claim of hostile work environment.

For the reasons set forth below, Defendant's motion is GRANTED in its entirety.

## BACKGROUND [1]

### A. The Parties

Plaintiff is an African–American male who was born on March 4, 1944 and is currently fifty-nine (59) years of age. He has been employed at the Hospital, a not-

---

1. The facts are derived from the parties' Local Rule 56.1 Statements and are not in dispute

except as noted.

for-profit hospital specializing in cardiac care, since 1974 as an Aide in the Department of Environmental Services (the "Department"). He remains employed in this position, working the same 4 p.m. to 12 a.m. shift (the "Night Shift"), that he has held since his employment at St. Francis commenced. (Pl. 56.1 Stmt. ¶ 5; Pl. Dep. at 161.) Plaintiff's duties include cleaning, washing windows, floors and carpets and picking up garbage.

Of the approximately twenty (20) employees on the Night Shift, Plaintiff contends that from 1996–2000 he was the oldest and the only African–American. He also asserts that he is the second-oldest Aide in the Department. (Pl. Tr. 123–125, 135–136.)

Plaintiff was directly supervised by Nelson Tobon ("Tobon"), Supervisor of Environmental Services. Tobon is Hispanic and was born on August 13, 1956. Plaintiff was also supervised by Gerard Lockwood ("Lockwood"), the Director of Environmental Services, Maria DiFeo ("DiFeo"), Assistant Director of Environmental Services, and Jim Plotner ("Plotner"), an Environmental Supervisor on the day shift. Lockwood, DiFeo, and Plotner are Caucasian and were born in 1956, 1946, and 1957, respectively.

## B. Plaintiff's Work Evaluations and Performance Record

In his Complaint, Plaintiff asserts that prior to Tobon becoming his supervisor in 1991, he did not have any "difficulty and his performance was generally good/satisfactory." (Compl.¶ 20.) Plaintiff also contends that "[u]pon Mr. Tobon becoming plaintiff's supervisor, plaintiff's job evaluations drastically declined, without justification." (Pl. 56.1 Stmt. ¶ 22.) Defendant claims that Plaintiff's poor performance did not simply arise with his new supervision but instead traces back to 1988, including poor evaluations and three suspen-

sions which occurred prior to the hiring of Tobon.

Plaintiff's work evaluations and disciplinary record evidence that Plaintiff's work performance has suffered since at least 1988. For the period from 1989–1990, Plaintiff scored 246 points on his work evaluation. This is on the low end of the satisfactory spectrum, which ranges from 230–319 points. (Lockwood Aff. ¶ 19; Ex. 23.) For 1991–1992, Plaintiff scored 232 points, only two points above satisfactory. (Lockwood Aff. ¶ 19; Ex. 25.) Plaintiff's other scores up until 1996 were in the same range. (Lockwood Aff. ¶ 19; Exs. 24, 27–29.)

Beginning in 1997, the Hospital began to evaluate employees' performance on a different scale. (Lockwood Aff. ¶ 17.) The different scales were "needs improvement," "meets," or "exceeds." (Lockwood Aff. ¶ 17.) In every annual review, beginning in May 1996, Plaintiff received a "needs improvement" rating. (Lockwood Aff. ¶ 19; Ex. 30.)

Plaintiff does not specifically dispute his work evaluations, but contends they were "unfair." (Pl. Dep. at 154.) For example, Plaintiff refused to sign his May 2000 evaluation and wrote, "I respectfully disagree with my job evaluation. I feel my work is not being evaluated objectively." (Pl. 56.1 Stmt. ¶ 50.) At his deposition, however, Plaintiff admitted to not putting forth a one hundred (100) percent effort into his job and that the Hospital did not have the right to require one hundred percent from its employees. (Pl. Dep. at 36.) Plaintiff also testified that he did not believe that an employee should be disciplined or terminated unless he performs less than "65 percent" of his job duties. (Pl. Dep. at 50–52.)

Plaintiff's disciplinary record is consistent with his work evaluations. The record shows that Plaintiff was warned and

counseled repeatedly from 1988 through 1994 and again from 1997 to 2000 for *inter alia,* poor cleaning, insubordination and falsifying his time-sheets. (Lockwood Aff. ¶ 9, Exs. 1–20.). The written record also documents that Plaintiff was suspended in 1988, 1989, and 1990, before Tobon was hired. (Lockwood Aff., Exs. 1, 3, 4.).

In suspending Plaintiff in 1988 for not using a wet-floor warning sign, his then supervisor, George Wilson, wrote that Plaintiff should "develop a more responsible attitude with respect to possible hazards & respect supervision."[2] (Lockwood Aff., Ex. 1.) In 1990, Daisey Williams, a supervisor who is also Black and four years older than Plaintiff, counseled Plaintiff for his disorganized and messy supply closet.[3] (Lockwood Aff., Ex. 5.) Plaintiff was also disciplined three times in the eleven month period prior to the filing his first SDHR complaint. (Lockwood Aff. ¶ 9, Exs. 12, 13 and 14.) None of these reprimands are specifically refuted by Plaintiff.

Between 1997 and 2002, Plaintiff received six (6) Constructive Discipline/Counseling Records ("Records"), which consisted of a series of verbal and written warnings involving unsatisfactory or poor work performance. This was the highest number Records of any employee in the Department. Plaintiff also received three of the five suspensions given in the Department between 1997 and 2002.

In February 1998, Plaintiff received a document from Plotner stating that his work was unsatisfactory. (Pl.Ex. M). On June 10, 1998, Plaintiff was suspended by Lockwood and Tobon without pay for two days due to poor work performance. (Lockwood Aff., Ex. 16.) In November 1999, Plaintiff was warned for not cleaning properly and in February 2000, Plaintiff was issued a written warning for unsatisfactory work performance. (Lockwood Aff., Ex. 17, 18.) In August 2000, Plaintiff was given a "final warning" for failing to clean a bathroom. (Lockwood Aff., Ex. 19.) A couple of months later Plaintiff was suspended for not completing a job assignment and for using profanity. (Pl.Ex. T.) On April 25, 2001, Plaintiff was again counseled and suspended for two days without pay because he allegedly declared Lockwood to be a racist. (Pl 56.1 Stmt. ¶ 57.)

## C. Denial of Productivity Bonuses and Merit Pay Increase

Plaintiff was denied a one-week productivity bonus in August 1998 and year end productivity bonuses in December 1998 and December 2000.[4] Defendant maintains its denial of bonuses to Plaintiff were in accordance with hospital policy, which provides that only employees in "good standing" are eligible. (Lockwood Aff. ¶ 21; Ex. 31.) "Good standing" is defined as "employee's performance supports a potential [applicable year] merit increase." (Id.) The Hospital's policy also allowed supervisor's to determine an employee as ineligible if they were suspended or had poor work performance which had been documented. (Id.)

No productivity bonuses were given to any Department Aide suspended in a relevant bonus period. (Lockwood Aff. ¶ 22.) Specifically, two other Aides, one who was younger and one who was non-Black, were

---

**2.** Tobon issued Plaintiff a warning for this same infraction in November 1992. (Lockwood Aff., Exs. 7 and 21.)

**3.** Tobon counseled Plaintiff for the same violation in November 1992. (Lockwood Aff. ¶ 11, Ex. 22.)

**4.** It is undisputed that Plaintiff always received his longevity bonus, which are based on years of service.

suspended in 1998 and neither received the bonuses after their suspensions. (Duke Aff. ¶ 9.) Plaintiff was the only Aide suspended in 2000, and the only Aide not to receive the bonus. (Duke Aff. ¶ 12.)

In February 2001, Plaintiff was notified that he would not receive a merit pay increase in 2001. Plaintiff alleges that this was due to race/age and retaliatory animus. Defendant contends that the denial was in accordance with its policy, which was instituted in 1997. The Hospital policy states that any employee receiving a "needs improvement" rating on his annual performance review is eligible for a 0% to a 1.9% merit raise. (Lockwood Aff. ¶ 24.) In addition, employees who have performance problems may receive lower merit increases. (Duke Aff. ¶ 13.) Defendant maintains that its denial of Plaintiff's 2001 merit pay increase resulted from his "needs improvement" rating on his annual performance review in 2000 and his suspension in 2000.[5] (Id.) Numerous other employees, including non-Blacks who were younger than 40 years of age were not granted merit pay increases in 1999 or 2001 due to poor performance. (Duke Aff. ¶ 17.)

Neither party has indicated whether Plaintiff had received bonuses or merit pay increases in the years prior to 1998.

**D. Denial of Vacation Request**

On June 26, 1998, Plaintiff was denied a vacation for December 21, 1998 until January 1, 1999. Plaintiff originally made his request in January 1998 and had previously received this vacation in years past. Defendant defends the denial of Plaintiff's vacation request because another Night Shift employee, Luis Serrano, had already been granted vacation during that period at the time Plaintiff made his request. (Lockwood Aff., Ex. 32.) Serrano's vaca-

tion was approved on January 22, 1998, prior to the date Plaintiff made his request. (Id.)

Vacation requests were granted on a first-come, first served basis. At the time of the request the Hospital had sixteen Aides on the Night Shift and the Hospital contends that it could not afford to have two Night Shift employees on vacation at the same time. (Lockwood Aff. ¶ 32.)

**E. Plaintiff's Workload and Required Documentation**

In his Complaint and on the instant motion, Plaintiff claims that he was given an unusually heavy workload, was required to document the time he started and finished an assignment and was required to complete assignments within a certain time frame. (Pl. 56.1 Stmt. ¶¶ 41, 42, 45, 47.) Defendant claims that Plaintiff's workload was comparable to similarly situated employees and that all Aides were required to document the assignments they completed. (Lockwood Aff. ¶¶ 27–29.)

## DISCUSSION

**A. Summary Judgment Standard**

A motion for summary judgment may not be granted unless the court determines that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Material facts are those which, under the applicable substantive law, may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine where, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

---

5. Plaintiff does not allege in his Complaint, or in the instant motion, that the denial of his

1999 merit increase was based on retaliation or discrimination.

The moving party bears the initial burden of informing the court of the basis of the motion and for identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this burden, the burden shifts to the nonmoving party to come forward with "specific facts showing there is a genuine issue of material fact." Fed R. Civ. P. 56(e). The nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993) (citations omitted). When the moving party has carried its initial burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In determining whether summary judgment is appropriate, the evidence of the nonmovant is to be credited and all justifiable inferences drawn in his favor. *Anderson*, 477 U.S. 242 at 255, 106 S.Ct. 2505, 91 L.Ed.2d 202. Moreover, "in discrimination cases where state of mind is at issue," summary judgment in favor of an employer should be granted sparingly because " 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.' " *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d. Cir.2003)(quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000)). "However, when the nonmoving party fails to make a showing on an essential element of its case with respect to which it bears the burden of proof, summary judgment will be granted." *Manz v. Gaffney*, 200 F.Supp.2d 207, 212 (E.D.N.Y.2002) (Wex-

ler, J.) (citing *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548).

**B. Race and Age Discrimination Claims**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). The ADEA proscribes such conduct with respect to age, specifically employees at least 40 years of age. 29 U.S.C. § 623, § 631(a). Section 1981 provides, in pertinent part, that, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." 42 U.S.C. § 1981.

In cases under Title VIII, the ADEA, and Section 1981, in which there is no direct evidence of discrimination, plaintiff's claims are analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, Woroski v. Nashua Corp.*, 31 F.3d 105, 108 (2d Cir.1994) (applying *McDonnell Douglas* standard to ADEA claims); *Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 245, n. 4 (S.D.N.Y.2001) (applying this standard to Section 1981 claims). Under this standard, the plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) he is a member of the protected class (race/age); (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to am inference of discriminatory intent. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden of establishing a *prima facie* case is de minimis. *Chambers v.*

*TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). "Under the *McDonnell Douglas* scheme, 'establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ "An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Terry v. Ashcroft,* 336 F.3d 128 (2d Cir.2003). An adverse employment may include "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.'" *Id.* at 137 (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.,* 993 F.2d 132, 136 (7th Cir.1993)). The Second Circuit has recognized that since neither the ADEA or Title VII defines adverse employment action solely in terms of job termination or reduced wages and benefits, less flagrant reprisals by employers may meet this standard. *See Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Id.* (citing *Welsh v. Derwinski,* 14 F.3d 85, 86 (1st Cir.1994)).

■ In regards to the fourth element of the *prima facie* case, an inference of discrimination may be drawn from a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably. *See Chambers v.*

*TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). Only the last of these is alleged by the Plaintiff in this action. In order to show such disparate treatment, the plaintiff must show that a similarly situated individual that is not in the plaintiff's protected class was more favorably treated. *Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 63 (2d Cir.1997). The comparable employee must be similarly situated to the plaintiff in all material respects. *Id.*

If the plaintiff successfully demonstrates the elements of a *prima facie* case, the burden of persuasion shifts to the employer to articulate "some legitimate non-discriminatory reason" justifying the alleged improper employment action. *Burdine,* 450 U.S. 248, at 254, 101 S.Ct. 1089, 67 L.Ed.2d 207. In meeting its burden, "[t]he employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. The Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir.1998).

Once the employer meets its burden, the presumption of discrimination drops out of the picture. *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742. At this point, "'to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Terry v. Ashcroft,* 336 F.3d at 137 (2d Cir.2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York,* 131 F.3d 305, 312 (2d Cir.1997)). The Plaintiff may, for example, establish that the employer's stated reason was a pretext for discrimination "'by showing that the employer's proffered explanation is unworthy of credence.'" *Reeves v. Sanderson Plumbing*

*Products, Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089). " 'The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.' " *Id.* at 147, 120 S.Ct. 2097 (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742). However, the Supreme Court has also stated that:

> [t]his is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For example, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Id.* at 148 (emphasis in original).

Plaintiff contends that he was discriminated against because he: (i) was disciplined more frequently than others; (ii) received poor performance evaluations; (iii) was denied a vacation request; (iv) was required to document his assignments; (v) was given a heavy workload; and (vi) was denied bonuses and a merit pay increase.

**1. Disciplinary Actions**

■ Assuming Plaintiff's disciplinary actions constitute a material change in his employment, Plaintiff has not shown that such actions give rise to an inference of discrimination. Plaintiff's unsupported and conclusory allegations that he was discriminated only after Tobon became his supervisor is contradicted by the record. Specifically, as set forth above, Plaintiff was suspended three times before Tobon was even hired. Since 1988 Plaintiff was disciplined by several different supervisors, including supervisors within Plaintiff's protected classes, for some of the same infractions as did Tobon and Lockwood. Plaintiff does not specifically refute this evidence. The fact that previous supervisors, not accused by Plaintiff of discrimination, similarly disciplined Plaintiff undermines any inference of discrimination.

In addition, Plaintiff's own testimony further belies any inference that his treatment was due to discriminatory animus and fails to show any disparate treatment:

Q: Do you know if you were treated differently from any other employee regarding your suspensions or write-ups?

A. I **don't know** about other people. That's none of my business.

\* \* \* \* \* \*

Q. Now, do you know if other employees in your department were given reprimands, warnings or counseling records?

A. I **don't know** that.

(Pl. Tr. at 67, 79; emphasis added.)

Accordingly, Plaintiff has failed to establish a *prima facie* case of discrimination based on disciplinary actions taken against him. Even assuming that Plaintiff did establish his *prima facie* case, the Hospital has set forth legitimate non-discriminatory reasons for each disciplinary action, which Plaintiff has failed to refute with any evidence other than his own conclusory statements that he believed the disciplinary actions were unwarranted. He does not, for example, refute the specific conduct

upon which each disciplinary action was based. On this record, no reasonable jury could find that discrimination was more likely than not the reason for the disciplinary actions.

### 2. Poor Performance Evaluations

■ "Negative evaluations alone, without any accompanying adverse result," do not constitute a material adverse change in employment. *Valentine v. Standard & Poor's,* 50 F.Supp.2d 262, 284 (S.D.N.Y.1999). In the instant case, however, it is clear that Plaintiff's poor performance reviews were the basis for the denial of merit pay increases. Accordingly, the Court finds that Plaintiff's reviews are sufficient to establish a material adverse change in employment.

Nonetheless, as is corroborated by Plaintiff's history of poor performance reviews by several different supervisors and Plaintiff's extensive disciplinary record, Defendant has proffered legitimate reasons for the poor evaluations; namely that Plaintiff deserved the reviews that he got. As in *Valentine,* "[m]ost of plaintiff's allegations of discrimination relating to his poor reviews are based on conclusory statements and plaintiff's feelings, beliefs and judgment about his own self-worth," which are insufficient to create an inference that the Defendant's stated reason is incorrect or a pretext for discrimination. *Id.* Similarly, in this case, Plaintiff bases his claim on his conclusory statement that his reviews were improper because, "[his supervisor is] not giving me the fairness of my work." (Pl. Tr. 154.)

Plaintiff's own admission that he did not give 100% to his job, further supports the proposition that Plaintiff did not deserve a higher grade on his evaluations. Plaintiff has failed to proffer any evidence that he deserved better evaluations or that employees outside his protected classes who performed similarly received superior reviews.

Based on the record, this Court agrees that Plaintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim or that a reasonable jury could find that Plaintiff was unlawfully discriminated against with respect to his evaluations.

### 3. Denial of Vacation Request

■ The Second Circuit has recently held that a denial of restoration of lost leave time is not sufficient to constitute an adverse employment action. *Terry v. Ashcroft,* 336 F.3d at 138 (2d Cir.2003). Similarly, this Court finds that, in this case, the denial of a one-time vacation request is not an material adverse employment action.

In addition, Defendant has failed to establish an inference of discrimination. As Plaintiff testified:

Q: Do you know whether or not [the Hospital's vacation policy] is applied differently to blacks and whites?

A. I don't know. I don't know.

Q. Do you know if it's applied differently compared to the young and old?

A. I don't know.

(Pl. Tr. at 137.)

■ Even assuming Plaintiff did establish a *prima facie* case, Defendant has articulated the legitimate non-discriminatory reason that another employee in the leanly staffed Department applied for, and was granted, the same vacation prior to Plaintiff. Defendant has supported this assertion with the records of the dated requests. (Lockwood Aff., Ex. 32.) Other than stating he had received this vacation request in years past and the fact that his request was denied, Plaintiff concedes he has proffered no evidence that he was denied this vacation due to racial or age based animus. (Pl. Tr. at 138.) Accordingly, Plaintiff has not provided any evidence by a which a reasonable jury could

find that Defendant's articulated reason was false or a pretext for discrimination.

### 4. Requirement That Plaintiff Document His Work Assignments

██ The requirement that Plaintiff document his assignments also does not constitute a material adverse change in his employment. It is, at most, a mere inconvenience. Plaintiff has also failed to establish an inference that the requirement that he document his work assignments was discriminatory. Specifically, Plaintiff's unsupported contentions in his Local 56.1 Statement that he was treated differently than other employees in this respect, is contradicted by Plaintiff's own testimony. In his deposition, Plaintiff stated:

Q: You know if other employees in your department were required to document their duties?

A. I **don't know** that.

Q. Do you know if other employees in your department were given work tickets?

A. I **don't know** that either.

Q. Do you know if any employees in your department were required to write down their tasks as they performed them?

A. I **don't know** that either.

Pl. Tr. at 78–79; emphasis added.

For the reasons stated, Plaintiff has not demonstrated his *prima facie* case in regards to documenting his assignments.

### 5. Amount of Work

██ Plaintiff's assertions that he was given too much work also do not raise an inference of discrimination. As Judge Glasser has affirmed, " '[a]n employer can set whatever performance standards he wants, provided they are not a mask for discrimination on forbidden grounds such as race or age. He can set unrealistic standards and fire an employee for not being able to meet them.' " *Williams v. Brooklyn Union Gas Co.*, 819 F.Supp. 214,

229 (E.D.N.Y.1993)(Glasser, J.) (citing *Palucki v. Sears Roebuck & Co.*, 879 F.2d 1568 (7th Cir.1989)).

In this case, there is no evidence to support an inference that Plaintiff's work assignments were excessive compared to other employees, or that they masked intentional discrimination. Once again, Plaintiff himself acknowledged that he had no evidence that he was given more work than other employees.

Q: Do you know if the same types of work were assigned to other employees?

A. I **don't** know that.

\* \* \* \* \* \*

Q. How do you know for a fact that these employees have less work than you?

A. I **don't** know for a fact, but I know by looking at those tickets that he give me that's just a lot of work for one man.

Q. Do you see the tickets that are given to other employees?

A. **No**, I'm not interested in that . . .

\* \* \* \* \* \*

Q. What evidence other than your own opinion do you have that this work is not fair?

A. I **don't** have no evidence.

\* \* \* \* \* \*

(Pl. Tr. at 62–63; 78.)(emphasis added.)

The mere fact that Plaintiff subjectively believes he was given an excessive amount of work does not create an inference of discrimination or create a triable issue of fact.

### 6. Denial of Productivity Bonus/Merit Pay Increase

██ It is well settled that the denial of a bonus or a merit increase do constitute a material adverse change. In addition, the Court will assume for the purposes of this motion that Plaintiff has established an

inference of discrimination in regards to pay based on Plaintiff's assertion that from 1996–2000 he: (i) was the oldest and the only African–American on the Night Shift; and (ii) the only Department employee who did not receive a productivity bonus in 2000.

Defendant has proffered legitimate, nondiscriminatory reasons for the denial of the productivity bonuses in 1998 and 2000, namely that Plaintiff had been suspended in those years and that the denial of the bonuses was therefore consistent with the Hospital's policy. Similarly, Defendant maintains that Plaintiff was denied a merit increase due to his "needs improvement" performance evaluation in 2000 and his suspension in that year.

Plaintiff has again failed to meet his burden of showing that the denial of the bonuses or pay increases were due to discriminatory animus. The Hospital's denial of productivity bonuses and merit raises were in accordance with Hospital policy. All other employees who were suspended in the relevant period similarly were not given productivity bonuses. (Duke Aff. ¶¶ 9–10.) Other employees, not in Plaintiff's protected class also did not receive merit pay increases due to poor performance. (Duke Aff. ¶ 17.) Indeed, in light of Plaintiff's statement that he was "doing like 80 percent of a good job", the denial of merit pay increases and productivity bonuses should not be considered extraordinary. (Pl. Tr. at 36.) Plaintiff's own testimony also evidences a lack of disparate treatment:

Q: Were you treated differently than any other employee regarding the bonuses, raises and longevity pay?

A. I don't know that either. That's not my business.

\* \* \* \* \* \*

Q. Is it possible that other employees didn't get yearly raises?

A. I don't know that either.

\* \* \* \* \* \*

Q. Other than your opinion in that regard, what evidence do you have that the fact that you weren't given a raise was discriminatory or retaliatory?

A. Like I said, the way he went about doing it.

Q. What's the way he went about doing it?

A. By not giving me the raise.

Q. Just the mere fact that he didn't give you the raise, is that the evidence that you have?

A. Yes, that's the mere fact.

Q. Anything else?

A. That's it.

(Pl. Tr. 67–68; 89; 100–101.)

All that Plaintiff has offered is that he was within protected classes and that he did not receive productivity bonuses or a merit pay increase. These facts alone are insufficient to warrant a trial. As set forth above, nothing in the record supports a finding that the disciplinary actions or evaluations, the basis for the denials of the bonuses and pay increase, were due to unlawful discrimination.

## C. Retaliation Claims

 Retaliation claims under the statutes at issue the are also evaluated according to the *McDonnell Douglas* three-prong standard. *See Terry v. Ashcroft*, 336 F.3d at 137 (2d Cir.2003). In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate by a preponderance of the evidence that: (1) participation in a protected activity known to the defendant; (2) an employee action disadvantaging the plaintiff; and (3) a casual connection between the protected activity and the adverse employment action. *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d

Cir.1998) (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308)(2d Cir.1995.)

■ Whether an employment action constitutes a material adverse change is analyzed under the same standard set forth above in the race/age discrimination context. A causal connection between the adverse action and the protected activity, is established where a plaintiff offers, (1) direct proof of retaliatory animus directed against the plaintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities. *McNair v. NYC Health & Hospital Co.,* 160 F.Supp.2d 601, 604 (S.D.N.Y.2001).

"The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (quoting *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1253 (10th Cir.2001)) The Supreme Court has indicated that action taken twenty (20) months, by itself, is insufficient for the purposes of establishing causality. *Id.* at 273–274, 121 S.Ct. 1508 (citing *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Circuit 1997)) (finding 3–month period insufficient).

■ "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 95 (2d Cir. 2001). Similarly, in this District Judge Wexler recently held that since plaintiff's "performance reviews issued after the filing of his notice of claim are consistent with those filed before Plaintiff engaged in this protected activity" there was no valid basis for a retaliation claim. *Manz v. Gaffney,* 200 F.Supp.2d 207, 219 (E.D.N.Y. 2002) (Wexler, J.), *aff'd in relevant part, in an unreported decision,* 56 Fed. Appx. 50.

■ Plaintiff claims that after filing his SDHR claim in June 1998, his "problems really got bad." (Pl. 56.1 Stmt. ¶ 24.) The factual bases for the retaliation claim are the same as for the race and age discrimination claims, namely the poor evaluations, disciplinary action, denial of Plaintiff's vacation request, denial of bonuses and pay increases, excessive amounts of work and the requirement that Plaintiff document his work assignments. Defendant argues that there is no casual connection because Plaintiff was treated no differently after he filed his SDHR claims than he was before.

As discussed *infra,* the denial of the vacation request, the requirement that Plaintiff document his work assignments, and the amount of work Plaintiff was given do not constitute an adverse employment action. The record further reveals that Plaintiff's poor performance evaluations and disciplinary record have been consistent since at least 1988. Based on the fact that Plaintiff's work evaluations and disciplinary record were consistent both before and after he filed his retaliation claim, this Court finds that Plaintiff has not established a causal relationship between the protected activity and his evaluations/disciplinary record.

While it is true that a defendant is not immune from a claim of retaliation merely by having taken action against an employee prior to a SDHR filing, in this case the record shows that Plaintiff was disciplined in a consistent manner, by several supervisors over a fourteen year period, and that those actions were warranted. Even if Plaintiff had established such a causal connection, as discussed above, Defendant has proffered legitimate reasons for its actions

which Plaintiff has failed to show were false or a pretext for discrimination.

Plaintiff contends that he was denied the productivity bonuses in August and December of 1998 and December 2000, and the merit pay increase in February 2001. Plaintiff filed his complaints in June 1998 and January 2000. The denial of the August 1998 bonus occurred within 3 months of the filing of the first SDHR complaint and therefore may establish time proximity. Although the denial of the December 2000 bonus and the pay increase occurred eleven and thirteen months, respectively, after the filing of the January 2000 SDHR claim, this was the first opportunity for which the Plaintiff could receive a monetary award after the incident, and therefore the Court will assume for the purposes of this motion that Plaintiff has established a causal connection.

Nonetheless, the Hospital has articulated non-discriminatory reasons for the decision not to pay Plaintiff bonuses or merit increases, namely suspensions and poor performance reviews. Despite the temporal proximity, Plaintiff has not proffered any evidence to establish that the stated reasons for the decision not to pay these financial considerations were due to retaliatory animus.

Since it is clear that Plaintiff had performed poorly for many years, evidence that Plaintiff had received these bonuses or pay increases in the past, despite his poor performance, might have allowed a jury to infer that the denial of the bonuses and increases in 1998 and 2001 were motived by retaliatory animus. However, Plaintiff, who has the burden of showing pretext, has provided no such evidence. Based on the record, this Court perceives no basis that would allow a reasonable jury to infer that the denial of the bonuses/pay increase were motivated for some reason other than Plaintiff's poor work perform-

ance. These payments were not given as a matter of course, but to reward employees who performed well. The record clearly shows that Plaintiff's performance did not warrant the conferral of these benefits. Accordingly, Plaintiff's retaliation claims are dismissed.

### D. Hostile Work Environment

■ To prevail on a hostile work environment claim, a plaintiff must prove (1) that the workplace is permeated with discriminatory intimidation, ridicule and insult that is "sufficiently severe or pervasive to alter the conditions of the victims employment and create an abusive working environment and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.2002) (citing *Perry v. Ethan Allen Inc.*, 115 F.3d 143, 149 (2d Cir.1997)). "This test has both objective and subjective elements; the misconduct shown must be 'severe or pervasive enough to create an objectively hostile environment' and the victim must also subjectively perceive that environment to be abusive.'" *Id.* (citations omitted.)

The factual basis for Plaintiff's hostile work environment claim is the same as his race/age and retaliation claims. As discussed above, other than Plaintiff's conclusory allegations in his 56.1 Statement and the Complaint, these allegations of discrimination are not supported by the record. Plaintiff does not allege that anybody employed at the Hospital ever made any derogatory comments about his race or age. The record is devoid of any evidence that the Hospital is permeated with race or age based "intimidation, ridicule, and insult." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Plaintiff's hostile

work environment claim is therefore dismissed.

## CONCLUSION

Defendant's motion is GRANTED. Plaintiff's Complaint is dismissed in its entirety. The Clerk of the Court is directed to close this case.

SO ORDERED.